IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PRITIRED 1, LLC,<br>PRINCIPAL LIFE INSURANCE<br>COMPANY,<br>TAX MATTERS PARTNER,<br><br>and<br><br>PRINCIPAL LIFE INSURANCE<br>COMPANY,<br><br>     Plaintiffs,<br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant. | No. 4:08-cv-00082-JAJ-TJS<br><br><br>**MEMORANDUM OPINION AND**<br><br>**ORDER** |

I. Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    A. Background and Notice of FPAA . . . . . . . . . . . . . . . . . . . . . . . . . 5
        1. Principal Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        2. Citibank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        3. Pritired1, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        4. French Banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        5. Notice of FPAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    B. Negotiations Forming Pritired Transaction . . . . . . . . . . . . . . . . . . 8
    C. Basic Structure and Performance of Pritired Transaction . . . . . . . . . . 15
        1. Basic Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        2. Voting Rights and Expected Duration of the Pritired Transaction . 19
        3. Calculation of Interest Rate . . . . . . . . . . . . . . . . . . . . . . . . 21
        4. Cash Flows, PC Swaps, and B Share Swaps . . . . . . . . . . . . . . 22
        5. Pritired Model Projections . . . . . . . . . . . . . . . . . . . . . . . . 27

      6. Actual Performance of Pritired Transaction . . . . . . . . . . . . . . . 30
  D. Debt and Equity Attributes of Pritired Transaction . . . . . . . . . . . . . . . 36
      1. Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           a. Andrew S. Carron . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           b. Joel Finard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           c. Michael Cragg . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
      2. Analysis of the Debt and Equity Characteristics . . . . . . . . . . . . . 44
           a. Characterization . . . . . . . . . . . . . . . . . . . . . . . . . . 46
           b. Market Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
           c. Credit Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
           d. Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
      3. Expected Economic Benefit of the Pritired Transaction . . . . . . . . 52

III. Background of Relevant Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
  A. Partnerships and Foreign Tax Credits . . . . . . . . . . . . . . . . . . . . . . 56
  B. Notice 98-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
  C. TEFRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
  D. Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

IV. Analysis of the FPAA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
  A. Whether the Pritired Transaction Should Be Characterized as a Loan . . . 63
      1. Intent to Form a Partnership . . . . . . . . . . . . . . . . . . . . . . . . 64
      2. Debt and Equity Characteristics . . . . . . . . . . . . . . . . . . . . . . 66
  B. Whether the Pritired Transaction Lacks Economic Substance . . . . . . . . 70
  C. Whether the Pritired Transaction Violates the Anti-Abuse Rule . . . . . . . 79
  D. Whether the Pritired Transaction Lacks Substantial Economic Effect . . . 83

V. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

    This matter comes before the Court pursuant to a bench trial held December 8-9, 13-15, and 17, 2010. The plaintiffs Pritired 1, LLC ("Pritired") and Principal Life Insurance Company ("Principal") were represented by Harold Schneebeck, Bruce Graves, and Varun Bhat. Defendant United States Government was represented by Stuart Gibson and James Strong. At the conclusion of the trial, the case was taken under advisement. The Court finds in favor of the United States.

The facts of this case are exceedingly complex. At the risk of oversimplification, the transaction at issue can be summarized as follows. American companies sent three hundred million dollars to French banks who combined the three hundred million dollars with nine hundred million dollars of their own. The money was used to earn income from low risk financial instruments. French income taxes were paid on the income from this approximately 1.2 billion dollar investment. The American companies received some cash from the income on the securities but, more importantly, were given the ability to claim foreign tax credits on the taxes paid on the entire 1.2 billion dollar pool. Through this transaction, the French banks were able to borrow three hundred million dollars at below market rates. The American companies received a very high return on an almost risk free investment. Only one thing could make such a transaction so favorable to everyone involved. United States taxpayers made it work.

## I. NATURE OF THE CASE

This case is a dispute surrounding a complex set of transactions involving two United States companies and two French banks. It was commenced pursuant to a petition for readjustment of partnership item based on a Notice of Final Partnership Administrative Adjustment ("FPAA") the Internal Revenue Service ("IRS") issued to Principal on December 20, 2007. I.R.C. § 6226(a)(2) ("tax matters partner may file a petition for readjustment of the partnership items for such taxable year with . . . the district court of the United States for the district in which the partnership's principal place of business is located"). The partnership tax provisions of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 970248, 96 Stat. 324 (1982) (codified as amended at 26 U.S.C. § 6221, *et seq.* (1997)), enable the IRS to examine income tax returns filed by partnerships and make adjustments through issuance of a FPAA pursuant to 26 U.S.C. § 6223(a)(2). Section 6226 of the Internal

Revenue Code permits this Court to conduct judicial review of the FPAA. I.R.C. § 6226(f).

Principal is the Tax Matters Partner for a partnership known as Pritired 1, LLC ("Pritired"). Pritired entered into a transaction with two French Banks, Bred Banque Populaire ("Bred") and Natexis Banque Populaire ("NBP") (collectively, "French Banks"). Citibank North America ("Citibank") designed the transaction. In this transaction, Pritired received $291 million of Perpetual Certificates ("PCs") and $9 million in "B Shares" from entities of the French Banks, LFI 4 SAS[1] and VAL A SAS (collectively "SAS") in exchange for $300 million in cash. The parties executed the transaction on October 27, 2000, and exited (unwound) it on December 31, 2005. As a result of the transaction, Principal claimed approximately $21 million in foreign tax credits against its taxable income for the years 2002 and 2003.

The IRS alleges that the Pritired transaction was structured to accrue foreign tax credits for its partners, but earn little to no cash return from its French investments. In the FPAA, the IRS determined that Principal was not entitled to claim Pritired's share of French foreign taxes paid or accrued for the years 2002 and 2003. Thus, the foreign tax credits for the partners of Pritired, including Principal were disallowed.

Principal disputes the FPAA's adjustments to the partnership income and filed this action to obtain a refund of the taxes resulting from the FPAA adjustments. Principal deposited the funds allegedly due and owing by reason of such adjustments, approximately $21.2 million. This action is to obtain a refund of that deposit. In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law.

---

[1]A *société par actions simplifiée* ("SAS") is a form of a simplified French business entity and is treated as a corporation under French law.

## II. Findings of Fact

### A. Background and Notice of FPAA

### 1. Principal Companies

Principal Financial Group is a multi-national insurance company that primarily engages in asset management and accumulation, including issuing insurance and annuity policies and guaranteed interest contracts. Principal Financial Group is a Delaware corporation with its principal place of business in Des Moines, Iowa. Final Pretrial Conference Order, Undisputed Facts ¶ A, Dkt. No. 57-1 (hereinafter "Undisputed Facts").

Plaintiff Principal Life Insurance Company[2] ("Principal") is an Iowa insurance company with its primary office in Des Moines, Iowa. *Id.* ¶ A. Principal is a wholly-owned second-tier subsidiary of Principal Financial Group, Inc. *Id.* Principal sells, among other things, insurance, annuity, and guaranteed interest contracts. In order to meet the liabilities from these contracts, it invests the premiums and other consideration received in a variety of assets, including stocks, bonds, notes, and other assets. Principal is a "spread lender" because it generates income based on the difference (or "spread") between what it pays out for capital and what it can earn by investing that capital.

Principal Capital Management, LLC, is a wholly-owned subsidiary of Principal Financial Group, Inc., and engages in asset management services. It provides investment management expertise and advice, and assists Principal in screening and exploring investment opportunities. *Id.* at 4, 15.

---

[2]There are multiple segments of Principal's business operations mentioned in this case, including Principal Financial Group, Inc., Principal Life Insurance Company, and Principal Capital Management, LLC. Unless specifically noted, whenever the Court uses "Principal," it is referring to the named plaintiff in this suit, Principal Life Insurance Company.

## 2. Citibank

Citibank is also a multi-national United States banking organization. Its Structured Products Group operates under the Global Corporate and Investment Bank division. Ex. 207 at 28. The Structured Products Group specializes in sophisticated financial market transactions and primarily serves clients that include large corporations, banks, or insurance companies.

Within the Structured Products Group is an organization headquartered in London, called the Citi Capital Structuring Group. Bruno Rovani and John Buckens were employees of the Citi Capital Structuring Group and were responsible for designing and creating sophisticated financial transactions. Rovani reported to Buckens and was a junior transactor responsible for developing models for the Pritired transaction. He also developed the Excel spreadsheets, the Pritired Model, which was of particular importance to this case. Rovani and Buckens believed that they had successfully structured transactions that would be viewed as upper-tier capital infusions for Europeans banks, with the capital infusions categorized as preferred stock for U.S. tax purposes for the U.S. investor.[3]

## 3. Pritired1, LLC

Plaintiff Pritired is a Delaware limited liability company with its primary office also in Des Moines, Iowa.[4] Undisputed Facts ¶ B. For federal income tax purposes,[5]

_____

[3]For example, they had structured a transaction in 1999 of 200 million euros between Citibank and Bred Banque Populaire. Citibank was the sole investor and was able to offset credits for French taxes against U.S. tax liability on foreign income.

[4]Pritired 1 formed a wholly-owned subsidiary, Pritired 2, which elected to be treated as a "disregarded entity" of Pritired 1 for U.S. tax purposes. Undisputed Facts ¶ B; Ex. 44.

[5]The consolidated federal income tax returns of Principal Financial Group, Inc. include the income, deductions, and tax credits of Principal for the periods in dispute here. Undisputed Facts ¶ A. These tax returns were filed with the Internal Revenue Service ("IRS") Center at Ogden, Utah. *Id.* Pritired's federal tax returns for the years in dispute were also filed with the IRS Center

Pritired filed an election under 26 U.S.C. § 6231(a)(1)(B)(ii) to have the partnership provisions of Subchapter C of Chapter 63 of the Internal Revenue Code ("IRC") apply to it. *Id.* This means that Pritired elected to be a "pass-through" partner, meaning that money it earned would "pass-through" to its partners. Principal and Citibank were the sole and equal partners in Pritired. *Id.*

Principal is Tax Matters Partner of Pritired for the taxable years 2002 and 2003, within the meaning of I.R.C. § 6231(a)(7) and Treasury Regulations §§ 301.6231(a)(7)-1(a), 301.6231(a)(7)-1(a). *Id.* ¶ D.

### 4. French Banks

Bred Banque Populaire ("Bred") and Natexis Banque Populaire ("NBP") are French banks. In 1999, the Banque Populaire organization was the fifth largest banking group in France.

The French Banks formed the subsidiaries LFI 4 SAS and VAL A SAS (collectively "SAS"). Pritired invested in PCs and "Class B" shares that SAS issued to it.

### 5. Notice of FPAA

On December 20, 2007, the IRS issued to Principal as Tax Matters Partner of Pritired a Notice of Final Partnership Administrative Adjustment ("FPAA") for the taxable years ended December 31, 2002, and 2003. Undisputed Facts ¶ E. The IRS alleged that the Pritired transaction was an abusive arrangement and its foreign tax credits were disallowed for five reasons: (1) the PCs and B Shares were considered to be debt instruments and not equity; (2) the transaction was a loan because Pritired was not a partner in the SAS; (3) pursuant to the anti-abuse rule in Treas. Reg. § 1.701-2, the transaction was re-characterized as a loan because the PCs and B Shares were debt instruments; (4) the special allocation of foreign tax credits to Pritired lacks economic

at Ogden, Utah. *Id.* ¶ B.

effect; and (5) the transaction generating the foreign tax credits lacks economic substance.

As a result of these findings, the IRS determined that Pritired was not entitled to claim an allocation of foreign taxes and disallowed its claimed share of foreign taxes. In turn, Principal was disallowed its claimed share of foreign taxes.

On February 21, 2008, Principal deposited with the Secretary of the Treasury of the United States the amounts—$21,293,978.00 collectively[6]—by which the tax liabilities of Principal would be increased if the Pritired partnership items in Principal's tax returns were made consistent with the treatment of the partnership items as proposed in the FPAA. *Id.* ¶ C.

## B. Negotiations Forming Pritired Transaction[7]

Citibank sought out an investment partner when an investment opportunity emerged for the Citi Capital Structuring Group towards the end of 1999. A new transaction was proposed with the French Banks to involve $300 million. Citibank considered this transaction too large to do alone and approached Principal to form a partnership. Rovani testified that the "Pritired transaction was a transaction in which French banks refinanced a portfolio or portfolios of securities at an attractive funding rate and in which two U.S. investors invested in order to earn an enhanced yield." Hybrid instruments would create a reduced rate of funding for the French Banks and an "enhanced return for the U.S. investors." Rovani explained that the Pritired transaction was appealing to the French Banks because they "could acquire capital at a rate below

---

[6]Principal paid to the United States Treasury $12,185,199.50 for the tax year 2002, and $9,108,778.00 for the tax year 2003. Undisputed Facts ¶ C. The Court notes that the numbers fall short of the total deposited with the United States Treasury by $.50.

[7]The Court refers interchangeably to this as the "Pritired transaction" or the "transaction."

market rates." The investment would result in savings in the cost of borrowing to the French Banks because the investment was between 80 and 100 basis points[8] lower than prevailing market rates. Rovani stated that "the return for U.S. investors was a combination of cash and a tax component which was made of credits."

Principal and Citibank engaged in extensive and complex discussions about the proposed transaction from February 2000, to when the transaction closed on October 27, 2000.[9] Exs. 10, 247, 248. Each company had its own internal approval procedures considering the size of the investment. Rovani testified about the procedure at Citibank, where the approval process began with an internal "mandate checklist" developed by Citibank. Exs. 66, 230. Citibank and the French Banks then signed a "mandate letter" on March 16, 2000, in which Citibank described the work it would undertake. Exs. 42, 5012, 5019. Because the investment purported to involve equity and subordinated debt, Citibank also approved a Major Expenditure Proposal for the transaction. Exs. 76, 5020, 5021. Finally, several managers approved a transactional approval memorandum ("TAM") describing the transaction in detail. Exs. 216, 229, 5018. In Citibank's TAM, it outlined the transaction overview and benefits to parties:

> From [French Banks'] point of view, the purpose of the transaction is to:
> - raise US$ 300 million of floating rate funding at LIBOR-50bps to LIBOR-100bps for 5 years,
> - refinance part of a US$ 1.2 billion portfolio of [asset-backed] securities,
> - diversify sources of funding,

---

[8]A basis point is a unit equal to 1/100th of 1%, and is a term used to indicate the change in a financial instrument. A 1% change is equal to 100 basis points.

[9]For its work in structuring the transaction, Citibank received a fee of 2.5% from Bred and Natexis on the $150 million of new capital provided to each of them, for a total of $7.5 million. Citibank also received a fee of 1.3%, or approximately $1.95 million, from Principal. Exs. 42, 226, 5012.

- raise financing which should quality as lower Tier II regulatory capital,
- raise financing which should qualify as Minority Interest for GAAP purposes.

From the US investors' point of view, the purpose of the transaction is to invest in a structure which:
- provides, in substance, senior debt exposure with a built-in equity buffer of 15%,
- qualifies as equity from a US tax point of view,
- provides unwinding flexibility according to capital accounts after 5 years,
- provides partial compensation and unwinding probability in case of change of law,
- avoids exposure to interest rate movements, being a floating rate US$ transaction,
- is governed by UK law.

Exs. 5018, 5018.1. The present value of the expected return on the transaction was $36.6 million, and excluding the value of the tax credits, Citibank projected an expected return from 4.2% to 4.65%. Exs. 80, 5018.

In January 2000, Buckens and Rovani initiated communications with Principal regarding its level of interest in the proposed securities. Buckens sent Kurt Lettow an email on January 25, 2000, bringing the Pritired transaction to Principal's attention. Lettow was a finance director at Principal Financial Group and his job was to analyze the company's investment portfolio and assist in identifying the appropriate tax treatments for the company's investments. In Buckens' email, he outlined the proposed structure to Lettow and stated that one of the "key terms and conditions" of the proposal was that the "US investors must be in a Foreign Tax Credit excess limitation position . . . in order to be able to absorb excess foreign tax credits generated by the investment." Ex. 65.1.

Buckens and Rovani traveled to Des Moines in February 2000, to present the

proposed transaction to a team at Principal. Ex. 65.2. Rovani testified that the PCs would be treated as debt for French and U.S. banking purposes, but treated as equity for U.S. tax purposes.[10] Rovani was copied on emails where it was indicated that "one of the prerequisites" for the transaction was that the U.S. investors could use the foreign tax credits generated from the transaction.

At Principal, the negotiations and discussions with Citibank were conducted primarily by Jeff Fossell, an investment professional serving in Principal Capital Management's portfolio management group. Exs. 84, 87, 88, 89. Fossell oversaw all the derivative trading and risk management for Principal and described himself as the "chief negotiator" with Citibank for the transaction. Numerous emails exchanged from April 2000, to October 2000, assisted in fleshing out the transaction details. For example, in an April 19, 2000, email addressed to several Principal employees, Buckens attached an updated description of the Pritired transaction and specifically referred to the PCs as "the subordinated debt portion."[11] Ex. 84. Fossell reiterated in emails on June 8 and 13, 2000, that Principal wanted restrictive investment guideline language for the assets in which the SAS could invest because he wanted "a high quality portfolio of supranationals, OECD and asset backeds . . . . " Exs. 86, 87. Principal wanted SAS to invest in high quality assets because if the Pritired PCs received a rating from a rating agency, then the instrument could be treated as NAIC[12] 1 debt in financial statements, which is a high quality debt rating. Ex. 164.

---

[10]This opinion was supported by the expert opinion of Stafford Smiley, a partner in the tax law firm of Caplin & Drysdale. Smiley accompanied Buckens and Rovani to Des Moines in order to provide his tax opinion on the transaction. He opined that the PCs would be treated as equity for U.S. tax purposes. Exs. 77, 78, 79.

[11]The PCs were also referred to as Undated Subordinated Securities, or "USS."

[12]"NAIC" is the acronym for the National Association of Insurance Commissioners.

The transaction's projected yield to investors included credits against U.S. taxes for the French taxes paid by the French entities. The IRS had issued Notice 98-5, 1998-3 I.R.B. 49 (hereinafter "Notice 98-5") on December 27, 1997, and this notice provided guidance to taxpayers investing in foreign securities. Specifically, it "identified two classes of transactions that create potential for foreign tax credit abuse" and cautioned against structuring foreign transactions that would "yield little or no economic profit relative to the expected U.S. tax benefits." Notice 98-5 at *1, *5. Buckens and Rovani referred to the ratio of the expected tax credits to the expected cash return as the "98-5 Ratio."

In reviewing the transaction, Fossell and others analyzed the spreadsheets (hereinafter "Pritired Model") that Rovani had prepared showing various projections. Ex. 80. Rovani helped develop the Pritired Model, which was a "cash flow model which recaps or describes the assumptions used in the transaction . . . and then describes the expected return on the investment." The Pritired Model[13] was critical to the projections and expectations of the parties and was referred to repeatedly in testimony. It was a dynamic Excel spreadsheet and incorporated the essential financial features of the transaction. The parties relied heavily on the Pritired Model for deciding whether to participate in the Pritired transaction based on its projections; it was updated and exchanged among all participants during the negotiations. Rovani created the Pritired Model to allow the parties to run their own assumptions about, *inter alia*, future cash flows, interest rates, and tax rates. For example, one scenario in the Pritired Model projected that Principal would yield a 4.34% return in the form of cash distributions on its $150 million investment, and if the projected credits against its U.S.

_____

[13]The projections of the Pritired Model are described in further detail in II.C.5. The final changes to the Pritired Model, as entered into evidence, occurred on October 20, 2000, several days before the transaction closed.

taxes for the French income taxes paid were included, then the total yield would jump to 12.62%. Ex. 80. Based on the projections in the Pritired Model, when interest rates dropped, tax credits would enhance the return despite a decrease in cash paid to the U.S. companies. The Pritired Model also detailed the anticipated cash flows with or without the tax credits and projected that the 98-5 Ratio would be 1.8:1. *Id.* According to the Pritired Model, expected total cash flows to Pritired from the SAS would be $65.57 million. *Id.*

The Pritired transaction was attractive to Principal. Fossell reported to Dennis Francis (at the time, the Chief Investment Officer and Senior Vice President of Principal Financial Group) throughout the negotiations and gave his opinion of the transaction: "we believe we can gain the higher yields associated with equity investments but without the onerous risk based capital treatment" and that "[t]he transaction provides access to supranational and OECD state debt issues which are more common to foreign regions of the world." Exs. 101, 102, 5059.

On May 26, 2000, Fossell made a presentation to Principal's Investment Committee ("IC")[14] and recommended the transaction for approval. He recalled presenting the transaction as one that would be treated as equity for tax purposes. His memorandum to the IC outlined the structure of the transaction and stated that the projected effective rate of return would be 13.96%. Exs. 98, 99. An asterisk on the memorandum indicated it was contemplated that the investment's floating rate could be exchanged (swapped) for a fixed rate.

The Pritired transaction also incorporated the use of derivatives and the IC was actively seeking greater use of derivatives in investments. Principal was seeking to

---

[14]Pursuant to company bylaws and as set by the board of directors, the Investment Committee must approve the acquisition of assets in excess of a certain value. Ex. 242. Principal's Investment Committee is comprised of senior officers of the company.

"us[e] an increased amount of derivative contracts to manage investment duration."
Ex. 217.  In a memo dated June 19, 1998, detailed that "duration needs can be
delivered through other means," such as through derivatives.  Ex. 218.  A derivative is
a financial instrument whose characteristics and value depend upon an underlying
security.  Investors use derivatives to manage the risk associated with the underlying
security, such as protecting against fluctuations in value.

The Court notes that it questioned Michael Gersie, Principal Financial Group's
Chief Financial Officer, whether the IC sought to use tax benefits as an enhanced
return.  The question was not answered to the Court's satisfaction.  Gersie responded
that if tax benefits were included in the Pritired transaction, then the IC would have
discussed whether there was a valid business purpose for the tax benefits/credits.
When the Court observed that FTCs were not included on the memorandum deal sheets
provided to the IC, Gersie explained that it was the IC's policy *not* to include FTCs on
deal sheets.  Exs. 98, 99.  The deal sheets were important in the IC's decision-making,
but did not have information such as return based on FTCs because the deal sheets were
ultimately given to NAIC for rating purposes.

The IC approved Fossell's recommendation on May 26, 2000, and a revised
memorandum was later prepared when the final numbers were slightly different from
the approved memorandum.  *Id.*  Fossell testified that even though the interest rates had
decreased from when the IC had approved the transaction to closing (6.79% to 6.76%),
Fossell viewed the "investment as a floating rate investment so what's more critical
there is that the spread margin that one can earn on an investment is still competitive
with then current spreads of comparable risk securities."  Further, that the spread
would be "sufficient to support the spread margins required on the issuance of

guaranteed interest contract liabilities." Even if the LIBOR[15] interest rates decreased, the Pritired transaction was expected to return yields higher than market rates because of the returns tied to the FTCs.

The transaction between Principal, Citibank, Bred and Natexis that came to be known as Pritired finally closed on October 27, 2000, and consisted in all material respects of the following elements, which the Court explains in greater detail in the next section.

*C. Basic Structure and Performance of Pritired Transaction*

In this section, the Court first describes the basic structure of the Pritired transaction. Next, the Court explains the voting rights of the Class A and B Shares and the expected duration of the transaction. This is followed by a description of how the parties calculated the LIBOR interest rate for the Pritired Model and its projections. Next, the Court examines the various cash flows the transaction generated, including the important "PC Swaps." An analysis of the Pritired Model's projections explains how the transaction was expected to work. Finally, the Court broadly traces the actual performance of the Pritired transaction from after its closing on October 27, 2000, to when the transaction ended approximately five years later.

1. Basic Structure

The Pritired transaction consisted, at its core, of investments[16] by two U.S. Taxpayers and two French Banks into entities created by the French Banks. The entities the French Banks created, the SAS, issued securities to the French Banks and

---

[15]LIBOR is an acronym for London Inter-Bank Offered Rate, and is defined as "the interest rate at which major international banks in London lend to each other." LIBOR can be denominated in different currencies. Here, LIBOR is denominated in the Pritired Model in U.S. dollars. As a result, LIBOR and US$ LIBOR are used interchangeably.

[16]The word "investment" as used in this opinion is used to describe the placement of the $300 million with SAS. It should not be read to mean equity or debt.

the U.S. Taxpayers.  The diagram below explains the transaction:



**A.**     ***Pritired Funding*** – First, the U.S. Taxpayers, Principal and Citibank, joined to form Pritired as a Delaware LLC in 2000.[17]  Pritired was a partnership and Principal and Citibank were its partners.  According to the Subscription Agreement dated October 27, 2000, Principal and Citibank each contributed $150 million to Pritired 1, for a total of $300 million.  Pritired's capital structure allocated $285 million to "144A debt[18]" and $15 million to equity.  Ex. 248 at 4, 10.  Principal received $142.5 million back in a "144A" debt note, with the other $7.5 million as an equity interest.  Ex. 163.  An internal memo characterized the $142.5 million note as "fixed maturity on the GAAP balance sheet and as a preferred stock on the SAP balance sheet."  Ex. 209.  Pritired now had $300 million to invest.

---

[17]Pritired subsequently formed a wholly-owned subsidiary LLC, called Pritired 2.  (Ex. 44)  Pritired 1 was classified as a partnership for U.S. income tax purposes, while Pritired 2 was characterized as a disregarded entity for U.S. income tax purposes  The Court refers to Pritired 1 and Pritired 2 as "Pritired."  *See* Treas. Reg. § 301.7701-2(a).

[18]The United States Securities and Exchange Commission uses the term "144A" to denote securities that may be issued to qualified institutional buyers without the requirement of a registration or prospectus.  Principal is a qualified institutional buyer.

**B.    *Pritired Investment* –** Second, Pritired transferred the entire $300 million to the SAS.  Of the $300 million transferred, SAS issued $9 million of Class B shares to Pritired and $291 million of PCs[19] to Pritired.  Exs. 43, 43.1.  Principal's share of each of these investments was $4.5 million and $145.5 million, respectively.  The PCs carried a floating interest rate of 3-month US$ LIBOR, plus a spread of 1%.  The PCs were "stapled" to the B Shares, meaning that neither the PCs or the B Shares could be sold, redeemed, or liquidated without the other.  Ex. 108 at art. 9.3.  Pritired's return from the transaction consisted of the interest from the PCs and dividends from the B Shares.

**C.    *French Banks Investment* –** The SAS was the French version of a limited liability company.  The creation of the SAS by the French Banks was, in many respects, similar to how the U.S. Taxpayers had created Pritired as a subsidiary.  The SAS executed the French equivalent to U.S. LLC Operating Agreements on the day the transaction closed.[20]  Exs. 43, 43.1.  The SAS had no physical offices, no employees, and could not form any subsidiaries.[21]

_____

[19]The PCs were also referred to as Undated Subordinated Securities.

[20]The SAS Agreements stipulated that the SAS were incorporated in France and subject to the French corporate income tax.  Exs. 43, 43.1 at art. 1.1.  The terms of the SAS Agreements provided that the earnings of the SAS would be its taxable income for French income tax purposes before any deductions for accrued French corporate income taxes or deductions for interest under the PCs.  *Id.* at art. 3(b). The SAS Agreements also provided for a "qualified income offset" within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(d)(6).  *Id.* at art. 3(d)(iii).  The French income taxes were defined as a non-deductible expenditure that were required to be charged against and paid out of the earnings allocated to the PC holder.  In addition, any French income taxes in excess of the earnings allocated to the PC holder were charged against earnings allocated to the PC holder for prior years and were required to be repaid by the PC holder in cash.  This clause was referred to as the "clawback" provision.  *Id.* at art. 3(c).

[21]The SAS filed an election to be classified as a partnership for U.S. income tax purposes.  Treas. Reg. § 301.7701-3, or the "check-the-box regulations," permits business entities to elect how they will be classified for U.S. income tax purposes.  For example, under these regulations

The French Banks then funded the SAS.  In exchange for $930 million provided by the French Banks, SAS issued to the French Banks $475 million in 1% Convertible Notes (Citibank referred to these as "Zeros" and the Court will also use this term) and $455 million in Class A Shares (common stock).  Exs. 45, 46.  From these investments, the French Banks' rate of return on the transaction included the 1% on the Zeros and also dividends from the A Shares.

**D.     *SAS Securities Purchase* –** When stripped of its superficial complexity, the Pritired transaction simply provided $300 million of new funds to the French Banks.  When added to the $930 million from the French Banks, SAS had $1.23 billion.

SAS used this to assume an existing portfolio of high quality debt securities from the French Banks, as well as other securities for which the French Banks were counterparties.  SAS was to have purchased the majority of these securities outright from the French Banks, and also approximately $368 million of securities pursuant to sale and repurchase agreements ("repos").  Under these repo agreements, the French Banks transferred a portfolio of securities to SAS, and agreed to repurchase the transferred securities for their original purchase price after a fixed period.  Because of the set repurchase price at the end of the fixed period, the French Banks would recoup 100% of its investment from the SAS.  Principal wanted little to no credit exposure from the French Banks, while still having access to a "high quality portfolio with little risk."  *See also* Ex. 5045 ("We have been clear since last spring that we will take NO risk to BRED/NATEXIS.")

The French Banks also provided interest rate floors to SAS which guaranteed a minimum level of income to SAS even if LIBOR rates dropped.  The floors benefitted

---

an eligible corporation may elect to be treated as a flow-through entity, such as a partnership, for tax purposes.  These regulations also apply to foreign eligible entities, such as a French *société par actions simplifiée*.  The SAS both elected to be treated as flow-through entities.

the French Banks by increasing the income of SAS, which in turn reduced the SAS payments to Pritired under the PC Swap (to be explained *infra*). Because the SAS were pass-through entities, the banks would not care if income were earned by the SAS or the banks themselves. However, income to the SAS was important to Pritired because it generated the tax credits that were valuable to Pritired and therefore Principal.

The French Banks themselves held the SAS portfolio for consolidated accounting and tax reporting purposes. They also managed the portfolio for SAS, but complied with very strict investment limitations and operations were designed to minimize risk of any loss to capital.[22]

### 2. *Voting Rights and Expected Duration of the Pritired Transaction*

The Bylaws of the SAS set forth the voting rights and expected duration of the Pritired transaction. At the beginning of the Pritired transaction, October 27, 2000, the A Shares had 98% of the voting rights of SAS, while the B Shares had 2% of the voting rights. Ex. 108 at art. 10.2. Prior to March 31, 2006, the A Shares could only be transferred to Pritired, as holder of the B Shares. *Id.* at art. 9.2. The A Shares had a 99% interest in the "distributable profit" (or residual income) of SAS, while the B Shares had a 1% interest in the "distributable profit." *Id.* at art. 18. Also, for as long as any of the PCs were outstanding, the B Shares could only be "transferred together

---

[22]Some of the restrictions included the following: (1) at least 90% of the assets in the portfolio were required to at all times be rated AA or higher, with the other 10% rated A or higher, Ex. 108 at annex 1 ¶¶ 1(b), 1(c), 5; (2) if any asset was downgraded below the ratings required, it had to be replaced within two weeks, *id.* ¶ 3(a); (3) the average gross yield on the investments could be no less than the annualized rate of 3-month US$ LIBOR, *id.* ¶ 5(f); (4) no instruments or securities could represent more than 5% of the entire portfolio, *id.* ¶ 1(g); (5) no investment could generate US source income or be "reasonably considered as likely to generate US source income," *id.* ¶ 3(b); and (6) the portfolio could only consist of obligations issued or guaranteed by an issuer incorporated in or a member of the Organization for Economic Cooperation and Development ("OECD") or a recognized "supranational" organization such as the World Bank, the Asian Development Bank, or the European Investment Bank. *Id.* ¶ 4(f).

with an amount of [PCs] stapled to them." *Id.* at art. 9.3.

Before December 31, 2005, the SAS could only be liquidated by a unanimous vote of the shareholders. *Id.* at art. 20. On or after December 31, 2005, SAS could be liquidated, or the entire Pritired transaction unwound, by a simple majority vote of shares. *Id.* If the transaction did not unwind by December 31, 2005, the voting rights of the A Shares automatically fell to 50.1%, while the voting rights of the B Shares automatically increased to 49.9%. *Id.* at art. 10.2. The B Shares also gained the unrestricted right to buy .2% voting control from the A Shares, thus increasing the voting rights of the B Shares to 50.1%.[23]

The Court finds that the provisions for change in voting rights reveals that the parties planned and expected the duration of the Pritired transaction to be five years. The internal approvals by Citibank, Principal, and the French Banks all suggested that the French Banks would unwind the transaction by the end of 2005. The change in voting rights on December 31, 2005, increasing the B Shares to 49.9% with the unrestricted right to buy .2% of voting control from the A Shares, also provided a measure for Pritired to force the transaction to unwind. With voting control, Pritired could end the transaction, liquidate SAS, and repay the PCs and B Shares.

Rovani testified that the French Banks had incentive to wind up the transaction because a loss in voting control would be "expensive" as "Pritired had the possibility of taking control of the French companies." Internal documents at Bred reinforced that the change in voting control "will maintain Bred's incentive to call the [PCs] and the Class B shares at the end of year 5." Ex. 5007.1.

The transaction's duration was virtually guaranteed to be five years. When the

---

[23]The change in voting control, or end of the transaction, was originally set to take place on September 30, 2005. However, because the end of the French accounting year is on December 31, 2005, the parties agreed to end the Pritired transaction on December 31, 2005.

transaction closed on October 27, 2000, Rovani sent an email congratulating the participating parties on their work in creating the transaction with an "anticipated tenor of five years." Ex. 83. Minton, Fossell, and Francis testified that, for asset-liability matching purposes, the Pritired transaction was presumed to unwind after five years. Fossell's memorandum to the IC highlighted that the average life of the transaction would be 5 years, with a duration of 3.55 years.[24] Ex. 98, 99. When the transaction closed, Fossell also stated in an email that the transaction "has a put/call between December 31, 2005 and March 31, 2006 to create an effective maturity of 5.2 years." Ex. 5037. Memoranda from Fossell on June 19, 2000, and October 4, 2000, corroborate that the transaction was expected to have a "5-year holding period." Exs. 5043, 5044. Internal documents at the SAS also reinforced a 5-year expected duration. Exs. 5006, 5011.

### 3. Calculation of Interest Rate

The Pritired Model forecasted the LIBOR interest rate for the life of the transaction. Rovani testified that the Pritired Model assumed the French corporate tax rate would stay steady and that the LIBOR interest rate would stay at 6.79%.[25] Ex. 80.

Although the transaction assumed LIBOR would stay around 6.79%, the actual interest rate for the transaction would "reset" every three months. This means, that although 6.79% was projected for the life of the transaction, the actual LIBOR interest

---

[24]Fossell clarified that the "duration" of 3.55 years in Exhibits 98 and 99 was a "financial formula . . . that take into account the timing and amount of cash flows over the horizon of an investment. Average life is a concept that takes into account just the return of principal on an investment."

[25]Rovani testified that the Pritired Model incorporated a LIBOR interest rate of 6.79% on October 20, 2000. Ex. 80. An email circulated on October 25, 2000, contained updated Bloomberg rates, projecting LIBOR at 6.76%. Ex. 90.1. On the day of closing, October 27, 2000, Rovani prepared a forecast summary sheet. Ex. 82. Some of the values had slightly changed since the preparation of the Pritired Model on October 20, 2000.

rate used for the transaction would change once every three months.

### 4. Cash Flows, PC Swaps, and B Share Swaps

Each of the four obligations issued by SAS carried a corresponding right to payment from SAS. The Zeros had the highest priority, followed by the PCs, A Shares, and B Shares. The French Banks held the Zeros (convertible notes) for their total face amount of US$ 475 million. The Zeros paid 1% interest per annum and at redemption, the French Banks had the "option to request redemption either in cash (for 110% of the face amount) or in new voting Class-A shares of the SAS (with an implied value on day 0 equal to the face amount." Exs. 5006, 5019. The SAS had a continuing obligation to pay 1% per year on the Zeros, or roughly $4.75 million, with the remaining obligations accruing and payable on maturity, either in the form of cash or in A Shares.

The PCs were next in priority and "senior only to the Class-A and Class-B shares, subordinated to the Zero-Coupon Convertible Note." Ex. 5019. Some of the relevant Terms and Conditions of the PCs included the following: (1) the amount payable each year to Pritired, or interest, was calculated using a floating rate of 3-month LIBOR plus a margin of 1%, Ex. 47 ¶¶ 4.1.3, 4.1.4; (2) the PCs were subordinate to the claims of senior creditors (the claims of Bred and Natexis on the Convertible Notes), *id.* ¶ 3; (3) the SAS issuer had to pay the annual amount due each year on the PCs if the SAS had paid a dividend on the A or B Shares in the previous year, and if the SAS failed to pay a dividend on the A or B Shares, then the SAS could defer payment on the PCs, *id.* ¶¶ 3.3, 4.3.2, 4.7; (4) the PCs could only be redeemed by the SAS upon liquidation, with the consent of the holder, or if any interpretation of or change in law made it illegal for the SAS to carry out its obligations under the PCs, *id.* ¶ 5.1; and (5) the PCs could only be transferred in units comprised of 32 B Shares for each $145,500 face amount of PCs. *Id.* ¶ 2.7.

Last in priority for liquidation and receiving cash flows were the A Shares and the B Shares, each of which, in liquidation, ranked equally in proportion to their positive capital accounts. As explained previously, the A Shares were allocated 99% of the residual income from the portfolio of debt securities, but the Class A shareholders (French Banks) had discretion to make "special allocations" of residual income. In effect, throughout the transaction, the French Banks could allocate all of the residual income to themselves, and none to the holders of the B Shares (U.S. Taxpayers).

Along with the PCs, however, Pritired and SAS executed a "PC Swap." Exs. 52, 5009. A swap is the exchange of streams of payments over time according to specified terms. A common type is an interest rate swap, when one party agrees to exchange an adjustable interest rate in return for a fixed interest rate from another party.[26] The PC Swap, in this case, changed the formula for determining the money that Pritired received from SAS.

Here, SAS was contractually obligated to make yearly payments of 3-month LIBOR plus a spread of 1%. In the same transaction, the PC Swap exchanged a Pay Leg for a Receive Leg in which both Legs of the PC Swap were a function of floating interest rates, but generated different streams of cash flows. In the Receive Leg of the PC Swap, Pritired paid and SAS received LIBOR plus a spread of 1%; this was the identical amount that SAS owed to Pritired on the PCs. In the Pay Leg of the PC Swap, SAS paid and Pritired received a payment flow based upon two components: (1) LIBOR plus an agreed upon spread (4.955% as to LFI 4 and 4.875% as to VAL A); minus (2) the French tax attributed to each SAS. Exs. 91, 92. Because the amounts due on the PCs equaled the amounts due on the Receive Leg of the PC Swap, Pritired

---

[26]For example, Party *A* and Party *B* each own $100 million investments. Party *A* is paid in Euros and Party *B* is paid in dollars. If *B* prefers Euros and *A* prefers dollars, they can swap income streams. Swaps can work with any number of other variables such as fixed versus variable interest rates.

and SAS would net these identical cash flows. These payments canceled each other out. As a result, SAS was only required to pay the amounts due on the Pay Leg of the PC Swap, or LIBOR plus the spread, minus the French taxes attributable to the SAS. The French taxes were based on the notional amount of the bond investment, or the total $1.23 billion portfolio. In essence, the parties simply traded LIBOR plus 1% for LIBOR plus about 5%, less the French taxes.



Rovani testified that the PC Swap was a hybrid instrument and the objective of the PC Swap was to make a debt-like return of LIBOR plus one percent look like an after-tax equity-like return. Principal was very concerned as to whether the PC Swap had a legitimate business purpose. Lettow articulated in an email to Buckens on June 13, 2000, that

> Lillian Chen, V.P. Corporate Tax, has requested that we identify/articulate the business purpose for the allocation of French taxes to the perpetual certificateholders. Her question concerns why the perpetual certificateholders (i.e. SPV 2) would agree to swap a return of LIBOR plus 100 for a return of LIBOR plus the SAS Spread minus the French Tax Amount. This is an excellent point in that even if the structure holds up otherwise, the allocation of taxes could still be challenged on the basis that there is no business purpose for the perpetual certificateholders to be allocated the entire tax burden.

Ex. 5111.  The PC Swap was approved despite this internal concern about the business purpose of the PC Swap.

Lettow also testified that the SAS was responsible for the Pay Leg, but "if the French tax amount that was allocated under this agreement exceeded the . . . floating amounts, the amount [paid] would be zero."  If the Pay Leg resulted in a negative amount, this scenario was termed a "clawback," as Rovani explained in some detail:

> [A clawback is] the situation in which there were more taxes paid by the companies than – that was a LIBOR plus spread amount in the PC Swap formula and so the question was how . . . this additional amount of taxes allocated and what the legal documentation said is that this additional amount of taxes for the current year had to be allocated to the PC Swap for the previous years . . . The effect was to increase the amount of taxes which were used in the LIBOR plus spread minus taxes paid calculation therefore [to] retroactively calculate an amount, a net amount to be paid by [the SAS] to Pritired of zero . . . The amount of the clawback is going to be equal to the amount of cash which was received on the PC Swap and which will have to be repaid.

A clawback occurrence impacted the amounts the investors received when the transaction unwound.  Principal, for example, would receive "$150 million less the amount of cash they had received as distributions under the Perpetual Certificates" for years when the PC Swap resulted in a positive net payment to Pritired.  Rovani testified that the Pritired Model did not show the clawback because the Model assumed that there would be a yearly cash payment on the PC Swaps and that "LIBOR plus spread would be higher than the amount of taxes allocated."

The impact of the PC Swap was to improve the value of the Pritired transaction for the French Banks.  Rovani explained that if the French tax rate increased (although it was projected in the Pritired Model to stay constant), then the French Banks would

pay more taxes, but less cash on the "PCs and PC Swap which was favorable to the French Bank." In fact, Rovani testified that there were no amounts to pay on the PC Swaps in 2002, 2003, 2004, and 2005, because "the amount of taxes was equal or higher than the amount calculated in the LIBOR plus spread." However, if the French tax rates decreased, the French Banks would pay more cash on the PCs and PC Swap. Through the PC Swap, Pritired was also able to claim credit for substantially all of the French taxes owed on the income of SAS.

At no point during the negotiation of the transaction did Citibank or Principal articulate a business purpose for entering into the PC Swaps. Lettow testified that because the transaction was approved by the Investment Committee, the committee must have been "satisfied that it had business purpose and economic substance." But no one explained what this business purpose and economic substance was thought to be. Rovani did not explain the purpose of the PC Swaps, other than to shift the French tax obligations to Pritired to create an equity-like return. Indeed, the only perceived purpose for entering into the PC Swaps was to generate foreign tax credits by the deemed transfer of the French tax obligations to Pritired. The Court finds that Principal did not sufficiently articulate a business purpose for the PC Swaps. The Court can identify no other non-tax business purpose for the PC Swaps arrangement, other than to make the cash flows from the PCs appear more equity-like.

Along with the PC Swaps, the parties engaged in a B Share Swap. Exs. 51, 5010. This transaction was much simpler, as Rovani explained:

> The B Share swaps relate to the B Shares which were the common shares issued by [SAS] and described by [Pritired]. This transaction was a dollar denominated transaction; but because the French entities are in France, they have to issue capital in euros so in order not to have exposure to euros, we put in place a B Share swap so to transform the euro denominated B Shares into effectively dollar denominated

shares.

In essence, the B Share Swap merely exchanged the euro denominated cash flows to dollar denominated cash flows. Also, Fossell testified that for foreign currency transactions, it was common for Principal to swap the currency to a fixed-rate equivalent.

Another component of the Pritired transaction's cash flows were the interest rate floors. The interest rate floors were contracts between each French bank and its respective subsidiary; the floors were set at 6.80%[27] and the SAS "paid" a premium to the French Banks for the floors.[28] Exs. 80, 5106. The floors operated as an insurance policy for the SAS in the event LIBOR interest rates declined below 6.80%. These floors were not required by Pritired or the U.S. Taxpayers and did not require the consent of any of the U.S. parties. Rovani testified that "if the [interest] rates drop below the reference rate [the subsidiary] will receive a payment equal to the difference between the actual rate and the reference rate in the contract and that is done in exchange for a premium." The Pritired Model did not project that the rates would be at levels which would require payments on the floors.

### 5. Pritired Model Projections

The Pritired Model developed by Rovani was crucially important in the parties' discussion, negotiation, and eventual decision to invest in the Pritired transaction.

---

[27]There is some discrepancy between the testimony and Ex. 5106. Rovani testified that the interest rate floor was set at 6.80%, which is corroborated by the Pritired Model. Ex. 80. However, it appears that at least one SAS, VAL A, set the interest rate floor at 6.76%. Ex. 5106. Regardless, the takeaway from the interest rate floors is that if the interest rate ever declined below the floor, the contract would pay the difference. For example, if LIBOR declined to 6.75%, the French Banks would pay to SAS the difference between 6.80% and 6.75%, or .05%.

[28]Remembering, of course, that the SAS and the French Banks were one for all practical purposes.

Rovani testified how he developed the Pritired Model and Lettow explained Principal's investment decision based on the projections. As relevant to Principal, the projections were all based on Principal's initial investment amount of $150 million.

When the Pritired Model was made, the US$ LIBOR interest rate for the Pritired Model was set at 6.79%. Ex. 80 at 3, 12. The Pritired Model assumed that the LIBOR interest rate would stay very close to 6.79% for the entire period.[29] Rovani testified the Pritired Model did not show any outcomes based on lower or higher interest rate scenarios because the then-market expectation was that the rate would stay around 6.79%.

Specifically as to Pritired's cash earnings, the Pritired Model projected the net present value ("NPV") of the total cash income to equal $26.58 million. *Id.* at 23. This was an after-tax return. NPV is the difference between the present value of cash inflows and the present value of cash outflows, and is useful in analyzing the profitability of a given investment. NPV represents the amount of cash Pritired expected to receive, adjusted for the time value of money. Here, the total cash income was comprised mainly of the PC Swaps, the Class B Swaps, and Class B share dividend income. The NPV of the Foreign Tax Credits ("FTC") was projected to be $48.50 million. *Id.* Lettow and Rovani then took $48.50 million divided by $26.58 million to equal 1.8, or the 98-5 Ratio. *Id.* at 24. Lettow testified that the 98-5 Ratio was calculated because it was "a touchstone in terms of reasonable – expected reasonable amount[s] of after-tax cash flow that we would receive from the transaction."

The Pritired Model also calculated the internal rate of return ("IRR") of the investment. IRR is the discount rate that makes the net present value of all cash flows

---

[29]The interest rate for the transaction had been derived from the swap curve; likewise, the discount rate for discounting the cash flows to present value was also derived from the swap curve. Exs. 90.1, 111, 116.

from a particular investment equal to zero. IRR can be used to rank investments because the higher an investment's IRR, the more desirable it is to undertake the investment. At the time the Pritired Model was developed, the tax exempt yields for AAA-rated general obligation municipal bonds and AA1 general obligation municipal bonds, were 4.58% and 4.55%, respectively. Ex. 111. In comparison, the after-tax cash-only IRR of the Pritired transaction was estimated to be 4.32%. (Ex. 80 at 24) The after-tax cash only IRR was less than the tax exempt yields for AAA and AA1-rated municipal bonds. When FTCs were added in, the IRR increased to 12.41%. *Id.* The IRR with FTCs was 5.62% *over* the US$ LIBOR interest rate of 6.79%. *Id.*

In sum, the Pritired Model projected positive returns to Pritired in its SAS investments. It demonstrated that a large proportion of expected cash flows would be derived from the PC Swaps. The parties knew that the interest rate could fluctuate and indeed, planned to reset the interest rate every three months. The parties also knew that changes in LIBOR would impact the return. Additionally, the parties were aware that SAS had hedged against interest rate drops by purchasing interest rate floors. Rovani conceded that the Pritired Model did not incorporate income from the interest rate floors, but this floor income could keep income high or consistent even if interest rates dropped. The following diagram demonstrates the relative return to Pritired from cash distributions and FTCs, depending on the LIBOR rate.



**Figure 3**
**French Bank Distributions Compared to Pritired Distributions**

*6. Actual Performance of Pritired Transaction*

Although the Pritired Model projected the transaction would generate a positive return without the foreign tax credits, this projection was only because of the assumption that LIBOR would remain constant, when it was actually falling both before the transaction closed and during the transaction. The transaction's return was sharply skewed by the abrupt and sustained decrease in LIBOR interest rates that had begun before the transaction was executed. The decline in rates immediately impacted the cash flow.

Principal suggested that was the result of the events of 9-11 but LIBOR rates had been falling for some time prior to 9-11. Between October 2000 and August 2001, before the events of September 11, 2001, the 3-month US$ LIBOR fell by 3.3%, from 6.8% to 3.5%. As a result of this decline in interest rates, the Court finds that the U.S. Taxpayers would receive virtually all of their economic return from the transaction in the form of claimed tax credits, versus actual cash distributions. But LIBOR fell further still. Between September 2001 (3.5%) and March 2004 (1%), 3-month US$ LIBOR fell by 2.5 percentage points, or 71%.



The actual US$ LIBOR rates used in the Pritired transaction, reset once every three months, are shown below:

| Year | Date Begin | Rate |
|---|---|---|
| 2000 | 10/27/2000 | 6.76000% |
| 2001 | 12/29/2000 | 6.44000% |
| | 3/30/2001 | 4.90250% |
| | 6/29/2001 | 3.71000% |
| | 9/28/2001 | 2.59156% |
| 2002 | 12/31/2001 | 1.90875% |
| | 3/28/2002 | 2.04813% |
| | 6/28/2002 | 1.85375% |
| | 9/30/2002 | 1.79594% |
| 2003 | 12/31/2002 | 1.40000% |
| | 3/31/2003 | 1.28875% |
| | 6/30/2003 | 1.10438% |
| | 9/30/2003 | 1.14125% |
| 2004 | 12/31/2003 | 1.16313% |
| | 3/31/2004 | 1.10938% |
| | 6/30/2004 | 1.58625% |
| | 9/30/2004 | 1.97500% |
| 2005 | 12/31/2004 | 2.55813% |
| | 3/31/2005 | 3.09313% |
| | 6/30/2005 | 3.48938% |
| | 9/30/2005 | 4.02113% |

Exs. 94.1, 147.

For each of the years 2000 through 2005, Rovani prepared electronic spreadsheets from the financial statements of the SAS documenting the actual outcome of the transaction based on US$ LIBOR. Exs. 60, 61, 63. He then forwarded the spreadsheets to Pritired's accountants and tax counsel in the U.S. to enable them to prepare Pritired's income tax returns. These spreadsheets constituted Pritired's financial records for U.S. tax purposes. Exs. 152-57. Peter Gutshall, the accountant at Kaiser Scherer Schlegel, PLLC who prepared Pritired's tax returns, testified about preparing the tax returns. Rovani also prepared a final spreadsheet (the "Pritired Actuals") on December 28, 2005, which contained all the cash flows and allocations for the entire Pritired transaction. Ex. 94.1.

Rovani testified about the results of the Pritired transaction. The Pritired Actuals set forth the financial results for the SAS and Pritired. It included the profit and loss ("P&L") statements for each SAS, and the "calculation of taxes" relative to the income. *Id.* at 4, 18, 19. A P&L statement summarizes the revenue and expenses incurred during a specific period of time. The SAS paid taxes on all the income and

most of these taxes were allocated to Pritired. Ex. 144. Gutshall testified that cash distributions on PCs from SAS were taken as deductions in calculating French taxes for each SAS. Then, from the overall taxes paid, Pritired could claim a portion of taxes and a corresponding amount as foreign tax credits. Exs. 144, 145.

Additionally, the French taxes were tied to the total income of each SAS. Although the portfolio return decreased, *see supra*, the interest rate floors kept the total income relatively consistent. The French taxes were based on the total income of the bond portfolio at $1.23 billion. Again looking at LFI 4 SAS, the French taxes for 2001 through 2005 were $13.5 million, $11.7 million, $11.3 million, $13.1 million, and $14.4 million, respectively. Exs. 60, 94.1 at 4. As Rovani explained, the French taxes affected Pritired's return[30] because the PC Swap formula was LIBOR plus a spread minus the French taxes.

Lettow testified to the amounts Pritired paid SAS and SAS paid Pritired pursuant to the PC Swaps. Exs. 148, 149, 151. Because LIBOR had decreased, Rovani and Lettow testified that there were no payments made on the PC Swaps for 2002, 2003, 2004, and 2005, "because the amount of [French] taxes was equal or higher than the amount calculated on the LIBOR plus spread." Exs. 81, 94.1 at 3, 149. Further, the clawback provision operated to recoup income the PC Swaps had paid in prior years, when French taxes exceeded LIBOR plus spread. Lettow testified that for VAL A, the clawback was "triggered" for issuer earnings of 2001 in the amounts of $198,761 and $588,128 for issuer earnings of 2002. Ex. 140 at 4. LFI 4 also had clawbacks in 2002 and 2003 of $1,270,345 and $348,452, respectively. *Id.* at 5. In total, the actual cash flow to Pritired under the PCs and B Shares, including their swaps and payment period interest, was as follows:

---

[30]The amount LFI 4 SAS paid on the B Shares to Pritired was also shown: $29,776 in 2001; $184,122 in 2002; $181,194 in 2003; $151,223 in 2004; and $177,476 in 2005. Ex. 94.1

|  | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| **LFI 4** | | | | | | |
| PCs | 727,255 | 891,543 | -0- | -0- | -0- | 1,618,798 |
| B Shares | 29,776 | 184,122 | 161,194 | 151,223 | 177,476 | 703,791 |
| Pymt. Per. Int. | 15,207 | 6,092 | -0- | -0- | -0- | 21,299 |
| | | | | | | |
| **VAL A** | | | | | | |
| PCs | 754,432 | -0- | -0- | -0- | -0- | 754,432 |
| B Shares | 27,096 | 186,918 | -0- | 772 | -0- | 214,014 |
| Pymt. Per. Int. | 15,776 | -0- | -0- | -0- | -0- | 15,776 |
| | $1,569,542 | $1,268,675 | $161,194 | $151,995 | $177,476 | **$3,328,110** |

Exs. 94.1 at 3, 17, 18; 150. This actual cash flow is significantly lower than projected.
For example, Lettow testified that Principal expected net cash flow to equal $6,036,304
in 2001. Ex. 177. Instead, the net cash flow was only $1,569,542.

The marked decrease in income raised more red flags throughout the rest of the
transaction. Lettow stated in an email on October 11, 2001, that "[t]he projections
appear skewed in regard to the ratio of credits to cash. LIBOR has declined
precipitously and so has our projected cash return. However, French taxes have not
declined by the same percentage . . . I'm concerned about our 98-5 ratio." Ex. 179.
Holly Henning, in the Investment Accounting and Reporting division, emailed Rovani
on February 3, 2002, with her concerns that, for 2001, the income estimate "was $1
million lower than what we had been accruing for during the year resulting in a
negative income accrual in January for this asset." Ex. 183 at 2. Rovani responded
that the lower income was a product of "less cash income [being] offset by more
taxes." *Id.* at 1. Fossell noted that "Bruno's assessment is accurate." *Id.* Principal
knew the Pritired transaction could have more "slippage" and actual cash income could
be severely reduced from the projections.

It was clear from testimony that Principal was very concerned with the
performance of the Pritired transaction. Fossell testified that after September 11, 2001,
LIBOR rates declined precipitously and that made cash returns decline significantly.

He testified that although the French taxes had not declined by the same percentage of LIBOR or the projected cash return, the tax credits did not decline because the built-in interest rate floors "kept the investment income of the SAS at or higher than cash or LIBOR rates." Lettow also testified that Principal became concerned when Rovani presented updated projections because "the 98-5 ratio or the ratio of foreign tax credits allocated to after-tax cash flow appeared skewed from what we had expected it to be." This was because the SAS income was artificially inflated due to the interest rate floors, so "even though LIBOR had fallen, and with it our after-tax return and our allocation of gross income from the SAS, the taxes had not fallen by the same percentage." Ex. 179.

Principal asserts that the events of September 11, 2001, affected the transaction in ways that the parties could not have foreseen when the transaction closed on October 27, 2000. It alleges that the decline in interest rates and the weak financial markets were completely unexpected. The Court disagrees. Using the Pritired Model, Principal simulated the outcome of a wide array of interest rates, whether higher or lower than 6.79%, and predicted how interest rates would impact the actual cash return. The Model forecasted the result of actual cash return and return in the form of foreign tax credits based on different interest rates. The predominant cash flow to be received by Pritired, the PC Swaps, were tied to the floating rate US$ LIBOR. The parties knew that even small fluctuations in interest rates would impact the transaction's returns. In his testimony about the Pritired Model, Rovani testified that instead of assuming the LIBOR rate would stay at 6.79%, he would have varied the rates and run "catastrophic scenarios."

Indeed, the transaction included a "clawback" provision, requiring the U.S. Taxpayers to reimburse SAS for any amounts previously distributed if the tax credits later generated more than 100% of the return on investment. Although Rovani testified

the parties never expected to use the clawback provision, incorporating the clawback into the Pritired Model demonstrates that the parties had a contingency mechanism in place. Lettow also testified that if interest rates had stayed at the rate assumed in the spreadsheet, then the clawback would not have been triggered.

Moreover, despite the pronounced decline in actual cash returns, Fossell explained that the Pritired transaction "performed as one would have expected that structure to perform. It returned floating rate cash flows and it returned the investors' share of tax credits." The Pritired transaction performed as expected when interest rates bottomed out; with low interest rates, the structure of the transaction was designed to churn out returns to Pritired based on tax credits, rather than actual cash. Fossell testified that if the return had only consisted of foreign tax credits, he would not have recommended the transaction because it would have lacked a business purpose.

In an email dated January 25, 2001, Lettow stated that "Principal's overall return comes from a combination of cash and foreign tax credits." Ex. 175. Lettow admitted that these all-tax credit returns disappointed Principal because it meant the Pritired transaction did not yield the expected amount of after-tax cash flow. The Pritired transaction was also internally referred to as "a foreign tax credit transaction." Ex. 181. In point of fact, the projected tax adjustments for 2001 predicted pre-tax investment income to be $6,093,304, with a tax adjustment for foreign taxes paid of $12,093,887. Ex. 232.

In short, before the transaction closed on October 27, 2000, Principal and Citibank knew that whichever way the LIBOR rate moved over the next approximately five years, the undisputed majority of their return would come from FTCs. Principal asserts that it could not have anticipated the decline in interest rates, but it also conceded that it had the dynamic Pritired Model to run projections and make predictions on future cash flows. The Court finds that the Pritired transaction was

designed to generate FTCs and FTCs were designed to be a large portion of the return if the LIBOR interest rate moved either up or down.

### D. Debt and Equity Attributes of Pritired Transaction

Also at issue is the characterization of the Pritired PCs and B Shares as equity or whether the instruments should be characterized as debt, or a loan to the French Banks. This is important in determining the economics of the transaction, such as if there was a business purpose to the transaction, whether the transaction had economic substance, and the risk and return the U.S. Taxpayers expected from the transaction.

In making its findings on the categorization of the PCs and B Shares, the Court considered the testimony of persons involved in the Pritired transaction, three experts offered by the parties, and reviewed five expert reports submitted by the parties. The Court briefly summarizes the expert opinions from the three experts and their reports admitted into evidence.

### 1. Experts

### a. Andrew S. Carron

Andrew S. Carron testified for Principal about: (1) whether the PCs and B Shares were more debt or equity-like; (2) the economics of the transaction; and (3) an analysis of the government's position on the appropriate tax. He submitted two reports as well as several graphs prepared in conjunction with his testimony.[31] Andrew S. Carron Expert Rep., Ex. 212; Rebuttal Expert Rep. of Andrew S. Carron, Ex. 213; Ex. 250; Ex. 251. Carron is the President of NERA Economic Consulting, a firm that performs economic analysis of complex transactions. He holds a Ph.D. in economics

---

[31]The Court also considered Carron's critique of the government's experts in his rebuttal report, but will incorporate Carron's opinions in the Court's comprehensive analysis of the experts' findings.

from Yale University and a Bachelor of Arts in economics from Harvard University. He has testified and acted as an expert both for and adverse to individual investors and the government in the areas of financial economics, fixed income securities and markets, damage estimation, and portfolio analysis and risk management.

Carron opined that the characteristics of the PCs and B Shares were more equity-like than debt-like. He considered the PCs to be a hybrid instrument, on a "mix" of debt and equity attributes. He looked at the following attributes in formulating his opinion: Characterization, Risk/Return Profile, Voting/Management Rights, Liquidation Rights, Priority, and Performance. He utilized the "Moody's Tool Kit: A Framework for Assessing Hybrid Securities," *Rating Methodology* (Moody's Inv. Serv. Global Credit Research, Dec. 1999) (hereinafter "Moody's Tool Kit") in formulating his opinion. Moody's Tool Kit was also separately admitted as Exhibit 188.

"Characterization" refers to the labels the parties place on an instrument. Carron found that the B Shares were clearly equity, but the PCs were "mixed" because there were references to the PCs as both equity and debt. "Risk/Return" meant the tradeoff between risk and return. He again concluded the B Shares were equity and also found the PCs to be equity because the swap agreement on the PCs made the return variable and more risky. "Voting/Management Rights" refers to the ability to participate in the management of the issuing entity. The B Shares were equity because they had voting rights. The PCs were equity when viewed in the context of the required stapling to the B Shares because the B Share voting rights were imputed to them, but were "mixed" when viewed in isolation of the B Shares. As for "liquidation," Carron considered the B Shares and PCs to be equity because there was no mechanism to trigger liquidation to recover the investment. The "priority" or relative rights among security holders for proceeds in the event of liquidation, was equity-like because the B Shares were ranked last and the PCs were subordinated to the

convertible notes, or Zeroes. Lastly, Carron considered the B Shares and PCs to be equity-like based on their "permanence" because there was no specific intent to repay the instruments before liquidation of the SAS. Overall, Carron opined that the PCs and B Shares were more equity-like than debt-like. Carron also testified that because the PCs looked like preferred shares and preferred shares are usually equity, then the PCs must be equity.

Carron also analyzed the Pritired transaction's economics. He opined that Principal had a valid business purpose for entering into the transaction because Principal expected to make money on the investment. He calculated a positive $26.29 million value for the "expected present value of cash receipts" ("expected PV of cash") with LIBOR pegged at 6.76%. Carron testified that this expected PV of cash discounted the cash flows but did not include the cost of the initial investment. Carron did not incorporate the clawback in his calculations of cash flow. In his report, he stated that "Pritired will receive varying but substantial portions of its economic benefit in cash though that portion will be reduced if LIBOR moves significantly in either direction from the starting point of 6.76%." Carron Exp. Rep. at 20. As to the tax to be charged, Carron concluded that the FPAA seeks to tax Pritired allocated income that it never received. Pritired received cash distributions totaling $2,847,554 and the IRS seeks to impose a tax on Pritired's partners' income of $49.1 million.

In rebuttal testimony, Carron also opined on the probability distribution of certain LIBOR interest rates over the transaction's life. He asserted it was incorrect to view historical LIBOR rates as predicting future rates, because it was more appropriate to predict future rates based on the swap curve. In Carron's calculations, for example, he determined that within the first year there was a 90% probability that LIBOR would be between 4.5% and 9%. Ex. 251. Also, that there was a less than 3% probability that LIBOR would be less than or equal to 3% by the end of the transaction.

**b. Joel Finard**

Joel Finard testified for the government and submitted a report concerning the capital market attributes of the PCs and B Shares. Joel Finard Expert Rep., Ex. 5079. Finard is the founding principal of CapMarket Consulting, a capital markets consulting practice. Finard holds a Ph.D./ABD in economics from Columbia University and a Bachelor of Arts in economics from the University of Massachusetts at Amherst. Finard is also a Chartered Financial Analyst. He has provided expert services in complex capital markets litigation involving structured transactions, risk management, and derivatives.

Finard opined on the capital market attributes of the PCs and B Shares using both a "top-down/structural" approach and a "bottom-up" approach. He concluded that the PCs and B Shares were financial instruments much more similar to debt than equity. Finard described the "top-down/structural" approach as looking from a capital markets point of view and the "bottom-up" approach as looking at specific attributes of the instruments (similar to Carron's approach).

Finard opined that the labels of the transaction for a structured finance transaction were not important elements because it was fundamental to look at the risk/reward of the transaction to understand how it was structured. He testified that the Pritired transaction was a complex structured transaction. Unlike Carron, Finard did not analogize the PCs to preferred securities because the "Pritired transaction is a one-off structured transaction so by definition it doesn't lend itself to look at textbook definitions of a particular security." He explained the purpose of a structured finance transaction as one that is effectively,

> trying to achieve either a tax regulatory, accounting, sometimes it might be a risk bifurcation so each of those things . . . in this case you are trying to achieve equity characterization . . . for the B Shares and for the PCs. If [the

U.S. Taxpayers] can get that, then they feel as though they can achieve the foreign tax credits. So that's the fundamental goal underlying this so from a structured finance point of view, you're going to try to give characteristics that make it look like it's equity.

He considered it important that the only "new" money injected into the transaction was the $300 million loaned by the U.S. Taxpayers, as the other $930 million came from the French Banks to the SAS (entities created by the French Banks). Finard opined that the bond portfolio of $1.23 billion was collateral for the PCs and B Shares because SAS was not pursuing an active role in the investments and there were restrictions to protect and maintain the value of the portfolio. He testified that it appeared that the U.S. Taxpayers were "trying to protect the assets and limited any risk associated with those assets so that [they] can get their $300 million back."

In his analysis, Finard grouped the attributes as (1) Market Risk (Maturity/Term and Risk/Return); (2) Credit Risk (Ongoing Payment and Priority in Liquidation); (3) Operations Risk (Voting Rights and Consequences of Non-Payment); and (4) Investment Analysis (Return Analysis and Investment Objective). Finard opined that the PCs and B Shares were both debt on the basis of Maturity/Term because there was a fixed or finite term of five years. Likewise, the Risk/Return analysis showed that the PCs and B Shares were more debt-like because there was limited or no change in the expected value of the respective financial instruments. Finard considered that ongoing payments were effectively required for both the PCs and B Shares because the transaction was designed in such a way that the payments could not be withheld without forcing the termination of the transaction. This gave the PCs and B Shares more debt-like characteristics. For Priority in Liquidation, the PCs were debt-like because they were subordinate to the Zeroes and senior to the A and B Shares. Conversely, although the stapling characteristic gave the B Shares some debt-like characteristics, Finard

considered the B Shares equity-like because they were last in priority. Both the PCs and B Shares were debt-like for Voting Rights because the PCs had no voting rights and the B Shares' voting rights were more similar to debt covenants than voting rights. For the debt-like PCs, there were consequences for non-payment as there was a 5% penalty—effective recourse—if payments were not made on the PCs. Conversely, there was no effective recourse or consequences if payments were not made on the B Shares. Lastly, Finard considered the B Shares and PCs to be debt-like for both the Return Analysis and Investment Objectives. There were floors and ceilings on the returns, thus fixing the possible range of returns for the PCs and B Shares. Likewise, there was a known return and a return of principal for both instruments and Pritired did not expect to be rewarded for any increase in the value of the SAS entity. These are very persuasive pieces of evidence that genuinely support his opinion.

Finard carefully scrutinized the PC Swaps because the PC Swaps created "one more level of complexity" and were designed to reduce the transparency of the circular cash flows. Finard opined that the "PC Swap was a vehicle used to transfer the tax . . . in the deal to generate the allocation of foreign tax credits and they used a derivative which is a financial instrument of a swap because it was an effective vehicle" to create value in the FTCs. The FTCs were leveraged and designed to enhance the tax credit available to the U.S. Taxpayers because the PC Swaps paid only LIBOR plus spread on the $291 million amount of the PCs, but the French tax were derived from revenue on the entire $1.23 billion value of the portfolio. A higher or lower LIBOR rate would leverage increases in the LIBOR rate by a factor of approximately 400% because the French tax amount would rise disproportionately to the fixed spread payable over LIBOR on the PC Swap. Finard opined that the investors would have known that changes from LIBOR at 6.76% would generate a return primarily comprised of FTCs.

Finard concluded that the industry standard requires that we test and analyze the

risk embedded in the transaction, such as analyzing the impact different interest rates would have on the transaction. Further, from a capital markets perspective, the SAS simply generated approximately a 530 basis point return over LIBOR for the U.S. Taxpayers and reduced borrowing costs of 100 to 150 basis points for the French Banks. He concluded that the Pritired transaction performed "very well" because although the return to the U.S. Taxpayers mostly consisted of FTCs, it returned the anticipated 530 basis point spread over LIBOR. In his expert opinion, the U.S. Taxpayers entered into the Pritired transaction expecting to lose money if the FTCs were excluded.

### c. Michael Cragg

Michael Cragg testified for the government and submitted a report examining the substantive economic effects of the Pritired transaction and the source of the financial economic benefit to the parties, such as whether the economic benefits were tax or non-tax in nature. Michael Cragg Expert Rep., Ex. 5080; Michael Cragg Rebuttal Expert Rep., Ex. 5081. Cragg is a principal in The Brattle Group, an economic consulting firm. He holds a Ph.D. in economics from Stanford University and a Bachelor of Science and Engineering from Princeton University. He has provided expert testimony in litigation involving antitrust and intellectual property, securities and valuation, securitization and structured finance, and tax matters.

First, Cragg analyzed the structure of the Pritired transaction and its cash flows. He testified that,

> the parties set up this special purpose vehicle called the SAS and the SAS is designed so that both parties are able to claim that they paid the taxes that are owed on the assets that are inside of the SAS so the French banks claim that they paid these taxes and then the U.S. entities claim that they paid these taxes and that creates effectively a double deduction and that deduction is taken in the U.S., that is the source of the benefits

42

in this transaction.  The loan and the PC Swap, the role that
they play in the transaction is to distribute the benefits amongst
the parties.

Cragg calculated the SAS earnings resulting from a range of interest rates over
the 5.2 years of the transaction and determined that "all but a trivial sliver is paid to the
French Banks" through the A Shares.  Cragg opined that the interest rate floors
between the SAS and French Banks kept the SAS income artificially high, despite the
fact that LIBOR rates were decreasing throughout the transaction.  These floors "would
allow the U.S. Taxpayers to continue to claim a minimum amount of post-tax benefits
even when interest rates dropped."  Further, the interest rate floors had no practical
benefit or effect on SAS or the French Banks.  Because the SAS was a holding
company of the French Banks, if there was a pay off from the French Banks to the
SAS, "the French Banks would have offsetting losses both before and after taxes."  The
French Banks also held the underlying securities and SAS had no possibility to profit
(or risk for that matter) in the value of the underlying securities.

Cragg determined that the cash flow projections "generated pre-tax losses under
all plausible scenarios" and the transaction was "guaranteed" to lose money.  He
calculated the NPV of the cash flows to Principal for the pre-tax, after-tax, and after-
tax with FTCs.  Using the 5-year U.S. Treasury risk-free rate of 5.79% for the
discount rate, the transaction generated negative $26,901,889 for pre-tax NPV,
negative $19,106,783 for after-tax NPV, and $25,646,772 for after-tax NPV with
FTCs added.  Using the transaction's LIBOR rate of 6.76%, these same numbers were
negative $32,424,969, negative $23,095,777, and $20,852,778, respectively.  In his
analysis, it was only after adding the FTCs to the cash flows that the transaction
generated positive cash flows.

Cragg also analyzed the debt and equity characterization of the investments.  He

opined that the PCs and B Shares were more like debt, *inter alia*, because these instruments had limited upside potential capped at the contractually-agreed upon returns. The fixed term of 5 years also strongly suggested that the PCs were debt.

In summary, Cragg opined that the Pritired transaction was entered into for the value of the FTCs and the transaction was anticipated to lose money absent the enhanced returns from the FTCs.

### 2. Analysis of the Debt and Equity Characteristics

The Pritired transaction is a type of "structured financial transaction," or SFT. At trial, the government offered the testimony of Finard and Principal offered the testimony of Carron, both experts in structured financial transactions. Both Finard and Carron analyzed the risk and reward attributes of the PCs and B Shares in the context of applying commonly used methods for understanding the risk and reward attributes of financial instruments. That is, they analyzed whether the risk and reward attributes of the PCs and B Shares are more commonly associated with debt or equity. The experts generally agreed on some of the tools to analyze the PCs and B Shares, but also disagreed on how to apply the tools. The experts reached different conclusions: Finard opined that the instruments were more debt-like, whereas Carron opined that the characteristics were more equity-like. The Court finds the analysis of Carron and Finard helpful in analyzing the risk and reward attributes of the PCs and B Shares, as well as understanding the economics of the Pritired transaction. The Court incorporates the findings of these experts in its own examination of the risk and reward attributes of these instruments. The Court finds, on balance, that the investment characteristics were like debt.

To begin with any analysis of the attributes of the instruments, the Court notes that there are financial obligations that fall at both ends of the debt-equity spectrum. For example, a simple note with a definite term and a fixed interest rate can be

considered "pure" debt.  *See, e.g. Gilbert v. Comm'r*, 248 F.2d 399, 402 (2d Cir. 1957) (a factor indicative of debt is a "fixed percentage in interest payable [to the creditor]");  *Hambuechen v. Comm'r*, 43 T.C. 90, 99 (1964) (another factor includes the "reasonableness of expectation of payment").  At the other end of the spectrum, a share of common stock in a publicly-traded corporation is generally considered "pure" equity.  The basic features of equity include no maturity, no ongoing payments that could trigger a default if unpaid, and rights to return of principal subordinate to creditors.  Ex. 190 at 5.  In between the ends of the spectrum lies an assortment of "hybrid" financial obligations —obligations that do not constitute either pure debt or pure equity.  As the Moody's Tool Kit explained, "[h]ybrid securities, which combine the features of both debt and equity, can take numerous forms including preferred securities, convertible subordinated debt, or preferred instruments that mandatorily convert to equity."  Ex. 188 at 3.  Preferred stock, as a hybrid example, is generally referred to as equity.  The PCs and B Shares are hybrid obligations.

Financial experts examine the attributes of the instrument to determine whether a financial vehicle is more like debt or equity.  This method examines the basic features of the instrument including, but not limited to, the risk and reward attributes of the security, such as liquidity, maturity, voting rights, and priority.  The specific attributes of the instrument are then compared to those commonly associated with debt or equity. IRS Notice 94-47 ("Notice 94-47") lists eight specific factors to consider:

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments give the holders the right to participate in the management of the issuer; (e) whether the issuer is thinly capitalized; (f) whether there is

> identity between holders of the instruments and stockholders of the issuer; (g) the label placed upon the instruments by the parties; and (h) whether the instruments are intended to be treated as debt or equity for non-tax purposes, including regulatory, rating agency, or financial accounting purposes.

*TIFD III-E, Inc. v. United States* (*Castle Harbor*), 459 F.3d 220, 236 n.15 (2d Cir. 2006) (citing factors in IRS Notice 94-47). "The purpose of the analysis is to bypass appearances and focus instead on practical realities." *Id.* (citations omitted). The Court incorporates the attributes in Notice 94-47 and the suggested attributes in the experts' reports to derive the following analysis of these groups: (a) Characterization; (b) Market Risk; (c) Credit Risk; and (d) Voting Rights. Here, it is difficult to separately analyze the PCs and B Shares because they were "stapled" together for redemption. But after analyzing these attributes, the Court finds that the PCs and B Shares have attributes much closer to debt than equity.

### a. Characterization[32]

Characterization refers to the labels the issuer and holders place on an instrument. The non-tax treatment of the instruments, such as how the instruments are treated or labeled for regulatory, rating agencies, or financial accounting purposes, is also important. But "[t]he form and the labels used for the transaction may signify little when the parties to the transaction are related," *Calumet Indus. Inc. v. Comm'r*, 95 T.C. 257, 286 (1990), and labels cannot transform debt into equity. *Estate of Mixon v. United States*, 464 F.2d 394, 402-03 (5th Cir. 1972).

The B Shares appear to have been consistently referred to as "shares," or intended to be equity by the issuer (SAS) and the investors (U.S. Taxpayers). Exs. 134, 135. However, the B Shares were "stapled" to the PCs and one could not be redeemed without the other. As a result, the Court finds that although the B Shares

---

[32]"Characterization" incorporates elements (g) and (h) of Notice 94-47.

were more equity-like, the characterization of the PCs influences the characterization of the B Shares. This is for the obvious reason that the B Shares were only 3% of the $300 million infusion.

The parties to the Pritired transaction used mixed and vague references when referring to the PCs. The PCs were invariably referred to as Undated Subordinated Securities or "general obligations of the issuers." Exs. 43, 43.1, 48; *see also* Exs. 42 ("subordinated debt portion"), 76 ("subordinated debt"), 84 ("subordinated debt"), 159 ("In order to try and convince Frederic this is a debt deal, Frederic wants a memo stating our argument on several guidelines he sent to me."), 162 ("The Pritired bond"). The PCs were also listed as preferred stock or "hybrid securities" on memoranda circulating within Principal and Citibank. Exs. 66, 83, 115, 174.

Jeff Wendell, an accountant in the investment reporting area whose duties were for proper GAAP and statutory accounting for investment assets, testified that Principal first filed the Pritired investment under a bond category with the NAIC. Pritired was later rated as preferred stock. Wendell testified that if an investment needs to be classified by the Securities Valuation Office ("SVO") of the NAIC, it is preferable to have instruments classified as debt versus equity because there are lower risk-based capital ("RBC") requirements. That is, there are lower reserves or cash requirements that the holder of the security must maintain. Ex. 161. For insurance company regulatory purposes, an insurance company must file with each state in which it does business an annual financial statement ("Annual Statement") prepared in accordance with the NAIC accounting rules. Investments in bonds are listed on Schedule D of the Annual Statement and stock investments, including preferred stocks, are listed on Schedule BA. Principal reported the 144A debt in Schedule D in 2000. The SVO required the Pritired investment to be moved to Schedule BA and shown as preferred stock for 2001 to 2005. Exs. 159, 161-64, 170-74, 209. Wendell testified that he

listed the Pritired investment under preferred stock for $142.5 million for the years ended 2001 and 2002. Exs. 171, 173. For years ended 2000 and 2001, the statutory based financial statements categorized the Pritired investment as preferred stock and placed it in the equity category. Exs. 170, 172, 174 at 57, 66, 67.

Emails substantiate the fact that, internally, there were disagreements and misunderstandings about the characterization and classification of the PCs. In an email on August 6, 2001, regulatory officials had assigned the PCs a preferred stock rating, but Fossell was attempting to convince the analyst that the PCs should "be a debt rating not a preferred." Ex. 159. Fossell wanted a memo "stating our argument on several guidelines . . . [and have] documentation to show why we feel it is debt instead of preferred[.]" *Id.*

The Court finds that the characterization of the PCs is mixed. The PCs were not equity for tax purposes merely because the parties sometimes referred to the PCs as preferred stock. Principal called the PCs debt when that was to its advantage. However, the Court accords less weight to this nomenclature and proceeds in its analysis.

### b. Market Risk[33]

The Court considers "Market Risk" to encapsulate both the maturity/term and changes in market value of the securities. For maturity/term, it is generally understood that there differences in the investment time line of debt and equity; debt usually has a known maturity and equity does not. While hybrid securities can have a mixed maturity, generally debt has a contractual maturity and equity usually has an unspecified maturity. Ex. 188 at 4.

It is beyond question that the Pritired transaction had an "expected maturity" date of 5 years. Numerous documents within Citibank and Principal referred to the

---

[33] "Market Risk" incorporates elements (a) and (e) of Notice 94-47.

PCs or the transaction as having a "maturity of 5 years" while other documents referred to the maturity as "effective maturity," "reset date," "anticipated tenor," "put/call option," or "unwind flexibility." Exs. 83, 5018, 5029, 5037, 5057. The SAS operating documents provided for liquidation of SAS upon adoption of a shareholder resolution by a simple majority on or after December 31, 2005. Before December 31, 2005, it would take unanimous shareholder approval to liquidate SAS. According to Finard, a failure to liquidate the transaction by December 31, 2005, could result in a loss to the French Banks of anywhere from $55 million to $291 million, depending on the value of the portfolio. No one who testified could think of any realistic scenario in which the transaction would not wind down as expected on December 31, 2005. The Court finds that, based on the expected, finite five-year maturity, the PCs and B Shares had maturity attributes more similar to those of debt than equity.

Additionally, there is a tradeoff between risk and return for equity and debt. That is, equity holders generally carry more risk than debt holders because there is more upside and downside potential. Equity holders invest to take ownership of an enterprise and their risk is commensurate with the potential that the enterprise will not increase in value. The holder of an equity investment may or may not receive any return on the investment, and may lose the principal entirely. Debt holders, on the other hand, generally expect the value of the full investment to be returned and to receive a return on the debt in the form of interest. Debt holders have only an expectation of an interest return and the return of their principal; they do not seek to increase or benefit from any increase in value of the enterprise.

Here, the market value of the PCs and B Shares at the end of the investment was expected to be (with the exception of the clawback) the initial investment value of approximately $300 million. The returns were also expected to provide predicable,

stable returns on both the PCs and the B Shares. The deal was structured to be almost risk-free so that Pritired would recoup its $300 million investment after five years.

Although the B Shares appeared to have a more equity-like return, the actual return had debt-like features. For example, the B Shares had a right to 1% of the SAS income, which was potentially uncapped. But the strict investment guidelines on the SAS bond portfolio effectively capped the return the B Shares could receive and the A Shares had a unilateral right to allocate gains generated by the portfolio to their own benefit. This, in effect, capped the return the B Shares could receive.

The Court concludes that the Pritired transaction was designed to give the PCs and B Shares the appearance of equity-like risk and return. Before LIBOR rates moved, Principal knew that the FTCs would comprise approximately 2/3 of the total financial benefits expected from the Pritired transaction. The transaction was designed to include both a floor and a ceiling on the combined investment return from the PCs and the B Shares, making the investments more debt-like. This lack of upside potential, the Court finds, was acceptable to Principal because the Pritired transaction was expected to return the bulk of the financial benefits from FTCs, and not cash flows. The Court finds that these market risk attributes are more consistent with debt than equity.

### c. Credit Risk[34]

The Court next considers the attributes of Credit Risk in the context of ongoing payment obligations and priority in liquidation. As the Moody's Tool Kit explained, "from a credit analysis perspective, the accountants' balance sheet classification is not as important as the way the security is expected to perform in terms of future cash flows." Ex. 188 at 5. Debt obligates the receiver of the funds to make ongoing payments, usually under the terms of the contract, while equity has no obligation to

---

[34] "Credit Risk" incorporates elements (b), (c), and (f) of Notice 94-47.

make any payments. A debtor may not miss a required interest payment without suffering consequences, such as default. If a debtor fails to make a required payment on a debt, the holder of that debt has legal recourse against the debtor. A receiver of equity capital, on the other hand, may decide not to pay dividends without suffering any similar contractual limitations. Equity holders generally cannot legally force the liquidation of an issuing entity based on a failure to pay. The ability to eliminate or vary dividend payments or other ongoing payment obligations is an important attribute of equity. Ex. 188 at 4.

The Court finds that the SAS had no contractual requirement to make ongoing payments on the PCs and B Shares. Conceivably, for as long as the SAS bond portfolio made money, the B Shares would receive 1%; a failure to pay did not constitute default. But for the PCs, the Court finds that the transaction was designed in a manner to ensure that payments would be made, based on Finard's analysis that there was effectively a 5% penalty if the SAS withheld or deferred payments on the PCs. The Court finds that, generally, the PCs had ongoing payment attributes more similar to debt and the B Shares had attributes more similar to equity.

For liquidation purposes, debt is generally paid before equity. Debt is a priority claim on the profits and assets of an entity and occupies a senior priority position to equity. In other words, if a company liquidates, debt has a higher priority, or right, to receive payments before equity. Ex. 188 at 4.

Here, the PCs were second in priority in liquidation, junior only to the Zeroes, while the A and B Shares took last. But the PCs and B Shares were "stapled" and one could not be redeemed without the other. Even so, the Court finds that the PCs had liquidation priority characteristics more similar to debt, whereas the B Shares were more similar to equity.

### d. Voting Rights[35]

Another distinguishing feature for the attributes of a hybrid security involve the voting rights. Generally, equity investors have voting rights to choose and direct the management of an enterprise, while debt holders do not. Different classes of equity may have different levels of participation in management or have no participation at all.

Here, the PCs had no voting rights while the B Shares had a 2% voting interest until December 31, 2005. However, all decisions prior to December 31, 2005, required a unanimous resolution of the shareholders, so the voting rights of the B Shares effectively had more control than the nominal 2% figure. Finard opined, and the Court agrees, that the voting rights of the B Shares were more in the form of controls seen in debt covenants, than in equity arrangements. The B Shares had *de facto* control of key SAS business operations, such as increasing or decreasing capital; changing the terms and conditions of the management of the securities portfolio; issuing any liabilities; and liquidation before December 31, 2005. The Court finds that the B Shares and PCs (without any voting rights), had voting rights attributes more similar to debt than to equity.

In summary, the Court finds that after looking at the capital market attributes of the PCs and B Shares, the PCs and B Shares had attributes that more closely resembled debt rather than equity. Because the attributes appear more debt-like than equity-like, the Court finds that the U.S. Taxpayers' investment was in the form of a loan, or debt, rather than an equity investment.

### 3. Expected Economic Benefit of the Pritired Transaction

Beyond analyzing the attributes of the PCs and B Shares, the Court also looked to the expected economic benefit of the Pritired transaction to determine whether the U.S. Taxpayers had a realistic, reasonable opportunity to earn a profit independent

---

[35]"Voting Rights" incorporates element (d) of Notice 94-47.

from foreign tax credits. The Court incorporates the testimony and findings of the government's experts in reaching its conclusion. The Court concludes that the U.S. Taxpayers likely did not expect to earn a meaningful return independent of foreign tax credits.

The experts generally agreed that whichever way interest rates moved during the life of the Pritired transaction, the U.S. Taxpayers would receive a larger portion of their return on investment in the form of FTCs. They also agreed that during 2002 and 2003, Principal realized almost 100% of its return from FTCs, instead of cash distributions from the underlying investments.

Technically, the SAS had income from three sources: the portfolio of underlying securities of $1.23 billion; returns on the repos it had executed with the French Banks; and returns on the interest rate floors in the event of low interest rates. As the Court has previously explained, the floors ensured that there would always be a minimum return to SAS despite any unexpected drops in interest rates. According to Cragg, SAS's effective income was approximately "the U.S. LIBOR rate in each period plus 47 basis points applied to the notional portfolio of $1.23 billion, with a minimum return of about $80 million per year." The French Banks anticipated earning the bulk of their earnings through their A Share distributions, with the return to Pritired tied largely to the PCs (and later PC Swaps). Cragg opined that, with US$ LIBOR at 6.76%, the SAS would pay Pritired about $30 million over the course of 5.2 years, and would pay the French Banks more than $500 million. With LIBOR above 10.4% or below 4.6%, Pritired would derive its return entirely from FTCs. Cragg opined that if LIBOR was above 10.4%, the French Banks could earn more than $800 million and would earn $500 million if LIBOR fell to below 4.6%. Pritired's return was tied to and limited by LIBOR rates, including a possibility of zero cash return based on LIBOR's movement. In contrast, the French Banks stood to make anywhere from $500 million to $800

million despite the movement of LIBOR. The Court finds the graph from Cragg's report effectively illustrates how Pritired anticipated its return as compared to the A Share distribution to the French Banks.



**Figure 3**
**French Bank Distributions Compared to Pritired Distribution**

As explained earlier, the interest rate floors were also a component of the SAS income stream. The interest rate floors provided for a constant, minimum level of income for SAS. The French Banks would then always receive a minimum return for the A Shares distribution. However, the interest rate floors also built-in a corresponding minimum level of FTCs to the U.S. Taxpayers. There would always be a minimum amount of French taxes payable based on the floor income. If interest rates rose, SAS income would increase (based on US$ LIBOR), thereby increasing the French taxes payable. In both circumstances, with an increasing or falling LIBOR, the French taxes were allocable to the U.S. Taxpayers on the PC Swaps. The Court adopts Cragg's explanation of the impact of interest rates on Pritired's expected tax benefit compared to its cash distribution.



**Figure 5**
**Pritired Tax Benefit Compared to Pritired Distribution**

In analyzing the expected economic benefit of the Pritired transaction, the Court also considers the impact of the "clawback" on Pritired's return. As explained above, the cash distributions to Pritired decreased when LIBOR moved away from 6.76%. If, in fact, the U.S. Taxpayers had received cash distributions earlier in the transaction, the U.S. Taxpayers had to return to SAS all or part of the cash, in the event the net payments on the PCs and PC Swap were negative. As a result, the French Banks could recoup a loss by "clawing back" from cash Pritired received in years prior. The Court finds that the U.S. Taxpayers expected the financial benefits to be skewed towards the FTCs and away from cash returns on the portfolio investments when LIBOR moved from 6.76%. The U.S. Taxpayers projected the FTCs to comprise 2/3 of the financial benefits and it was foreseeable that changes in LIBOR could increase the return from FTCs. The Court adopts Cragg's analysis of the cash versus FTC return, as shown below:

| US Taxpayers' Percentage Split of "Value" Payment Between Cash and FTCs | | | | | | |
|---|---|---|---|---|---|---|
| | 12/31/2000* | 12/31/2001 | 12/31/2002 | 12/31/2003 | 12/31/2004 | 12/31/2005 |
| **Cash %** | 25% | 4% | 0% | -2% | -1% | 0% |
| **FTC %** | 75% | 96% | 100% | 102% | 101% | 100% |

*Short Stub Period from 10/27/00 to 12/31/00

The Court finds that the Pritired transaction did not make economic sense without the FTCs. Cragg's analysis demonstrated that the return on the cash investment was negative and the Pritired transaction only generated a positive return on investment to the U.S. Taxpayers when the FTCs were included. The Court concludes that the Pritired transaction was guaranteed to be unattractive without the FTCs, any movement in LIBOR would increase the return from FTCs, and the FTCs were designed to generate the bulk of the financial benefits to U.S. Taxpayers.

## III. BACKGROUND OF RELEVANT LAW

### A. Partnerships and Foreign Tax Credits

Partnerships like Pritired are "flow-through" entities for Federal income tax purposes because they do not pay Federal income taxes. Instead, they file annual returns reporting the partners' distributive share or allocation of tax items. 26 U.S.C. §§ 701, 6031;[36] Treas. Reg. § 1.701-1. Individual partners, such as Citibank and Principal, report these distributive shares of the partnership tax items on their own Federal income tax returns. §§ 701-04; Treas. Reg. § 1.701-1, *et seq*.

Included within the income and credits partners must separately account for are their "distributive share of the partnership's . . . taxes, described in section 901, paid or accrued to foreign countries." § 702(a)(6). Income is to be characterized for tax purposes at the partnership level and retains its character when distributed to individual partners. *See Brown Group, Inc. v. C.I.R.*, 77 F.3d 217, 221 (8th Cir. 1996); § 702(b) ("character" of allocated item of income "shall be determined as if such item were

---

[36]Hereinafter, the Court refers to the Internal Revenue Code ("Title 26 U.S.C.") as "the Tax Code." All section references, unless otherwise noted, are to the Internal Revenue Code ("I.R.C.").

realized directly from the source . . ., or incurred in the same manner as incurred by the partnership."). A partner's distributive share is determined in accordance with the partnership agreement; except if the allocation lacks substantial economic effect, then the partner's distributive share becomes the "partner's interest in the partnership." § 704(a), (b). Section 901 allows a credit against U.S. income taxes for foreign taxes paid, with the credit limited in amount to the U.S. taxes calculated on all foreign-source income. §§ 901(a), 904(a). This section excludes foreign tax credits from offsetting U.S. taxes on U.S.-based income sources. The purpose of the Tax Code's foreign tax credit provisions is to reduce international double taxation. *See, e.g., United States v. Goodyear Tire and Rubber Co.*, 110 S. Ct. 462, 470 (1989); *Norwest Corp. v. Comm'r*, 69 F.3d 1404, 1407 (8th Cir. 1995).

## B. Notice 98-5

The IRS published Notice 98-5 on January 20, 1998. 1998-1 C.B. 334. A notice is akin to a "revenue ruling" and is an interpretation of the law offered by the IRS. While not binding precedent, revenue rulings—and notices—are entitled to "some weight," because the IRS "consider[s] them authoritative and binding." *Bankers Life and Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998) (citations omitted); *see also* Treas. Reg. §§ 601.201(a)(6), 1.6662-4(d)(3)(iii).

Notice 98-5 announced that Treasury and the IRS intended to issue regulations that would apply an economic profit test to address abusive tax-motivated transactions that generated foreign tax credits. The Notice explained that these abusive transactions "generally are structured to yield little or no economic profit relative to the expected U.S. tax benefits." Notice 98-5 at *1. It identified two classes of transactions that created a potential for tax abuse: (1) abusive arrangements where "foreign tax credits are effectively purchased by a U.S. taxpayer in an arrangement where the expected economic profit from the arrangement is insubstantial compared to the foreign tax

credits generated" (hereinafter "insubstantiality test") and (2) "cross-border tax arbitrage transactions that permit effective duplication of tax benefits." *Id.* at *6. The Notice described five examples of abusive arrangements pursuant to the two classes of abusive transactions. *Id.* at *6-12. Generally, the Notice explained that the anticipated regulations would "emphasize an objective approach to calculating expected economic profit and credits, . . . [and that] the regulations will require that expected economic profit be determined over the term of the arrangement, properly discounted to present value." *Id.* at *13-14.

Principal's main argument is that it relied on the Notice 98-5 when it structured the transaction. Principal asserts that its reliance on Notice 98-5 was reasonable because it calculated the Pritired transaction's "98-5 Ratio" to be in accord with the examples described in the Notice. Principal points out that, of the five examples in Notice 98-5, three examples derived a ratio of foreign tax credits to expected economic profit of 33 to 1, 12 to 1, and 8 to 1. It argues that its own 98-5 Ratio of approximately 2 to 1 was an acceptable reading of Notice 98-5.

Notice 98-5 was withdrawn on March 15, 2004, for the stated purpose that the Treasury Department and the IRS did not intend to issue regulations in the form described in Notice 98-5. Notice 2004-19, 2004-1 C.B. 606, Mar. 15, 2004.[37] It explained that the IRS would "challenge the claimed tax consequences of such transactions under the following principles of existing law: the substance over form doctrine, the step transaction doctrine, debt-equity principles, section 269, the partnership anti-abuse rules of § 1.701-2, and the substantial economic effect rules of § 1.704-1." As a follow-up to Notice 2004-19, the IRS issued temporary regulations that proscribed a partner's foreign tax credits to be "proportionate to a partner's distributive

---

[37]The Court still believes that it is appropriate to examine this transaction in the context of the law as it existed when the transaction was executed.

share of the partnership income to which such taxes relate." 2004-20 I.R.B. 903, 69 Fed. Reg. 21405-01, 21406. This effectively prohibited the distributive share arrangement used in the Pritired transaction.

## C. TEFRA

Congress enacted TEFRA to unify audit and litigation procedures for partnership tax items among partners in the same partnership. Pub. L. 97-248, sec. 402, 96 Stat. 648 (codified in scattered sections of 26 U.S.C.). "TEFRA was intended, in relevant part, to prevent inconsistent and inequitable income tax treatment between various partners of the same partnership resulting from conflicting determinations of partnership level items in individual partner proceedings." *RJT Invs. X v. C.I.R.*, 491 F.3d 732, 737 (8th Cir. 2007) (citing *Randell v. United States*, 64 F.3d 101, 103-04 (3d Cir. 1995); H.R. Conf. Rep. No. 97-960, at 599-600 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1371-72).

The tax treatment of any partnership item[38] is determined at the partnership level. § 6221. Treasury regulations expand upon the "partnership item" classification to include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)-1(b). Some examples include the partnership's method of accounting and "whether partnership activities have been engaged in with the intent to make a profit for purposes of § 183." *Id.* The Eighth Circuit Court of Appeals has held that determining whether the status of the partnership is a "sham" "falls squarely within this definition." *RJT Invs.*, 491 F.3d at 737-38.

When the IRS disagrees with a partnership's reporting of any partnership item, it

_____

[38]A "partnership item" is defined as "with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." § 6231(a)(3).

must issue an FPAA before making any assessments against the partners attributable to such an item. *See Virginia Historic Tax Credit Fund 2001 LP v. C.I.R.*, 639 F.3d 129, 136 (4th Cir. 2011) (citing 26 U.S.C. §§ 6223(a)(2), (d)(2), 6225(a)); *Marriott Int'l Resorts, LP v. United States*, 586 F.3d 962, 963 n.1 (Fed. Cl. 2009) (explaining TEFRA proceedings); *AD Global Fund, LLC ex rel. North Hills Holding, Inc. v. United States*, 481 F.3d 1351, 1352-53 (Fed. Cir. 2007) (FPAA "serves as a predicate to [IRS] making individual partner tax assessment"). In a TEFRA proceeding, the partners must be given notice of any administrative proceedings with respect to a partnership item, and after the IRS issues a notice of an FPAA to the tax matters partner, the tax matters partner may file a petition for readjustment of the partnership items. §§ 6223, 6226(a). This matter before the Court is a partnership-level case and the Court's jurisdiction, as a result, is limited to determining:

> all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment [FPAA] relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

§ 6226(f) (alteration added).

The Court turns to Principal's Notice of FPAA at issue in this case. Here, the IRS proposed that the Pritired transaction was an abusive arrangement and the foreign tax credits were disallowed. The FPAA stated,

> 1. It has been determined that you are not entitled to claim foreign tax credits for the purported payments of French tax because the Perpetual Certificates and the B shares issued by VAL A SAS and LFI 4 SAS are debt instruments, not equity, for U.S. tax purposes or are like debt instruments under U.S. tax principles. Therefore, Pritired is not a partner of VAL A SAS or LFI 4 SAS and cannot claim foreign tax credits

60

pursuant to I.R.C. §§ 702(a) and 901(a) for any French taxes paid by VAL A SAS or LFI 4 SAS,

2. Alternatively, it has been determined that the substance of the transaction is a loan from Pritired to the French banks, Therefore, Pritired is not a partner in VAL A SAS or LFI 4 SAS and it cannot claim credits pursuant to I.R.C. §§ 702(a) and 901(a) for any French taxes paid by VAL A SAS or LFI 4 SAS. It has been determined that Pritired holds debt of the French banks and receives interest from the French banks in the amount of the distributions on the securities of VAL A SAS and LFI 4 SAS,

3. Alternatively, the anti-abuse rule in Treas. Reg. § 1.701-2 applies to the transaction and requires re-characterization of the transaction as a loan from Pritired to the French banks. Therefore, Pritired is not a partner of either VAL A SAS or LFI 4 SAS and cannot claim credits pursuant to I.R.C. §§ 702(a) and 901(a) for any French taxes paid by VAL A SAS or LFI 4 SAS. It has been determined that Pritired holds debt of the French banks and receives interest from the French banks in the amount of the distributions on the securities of VAL A SAS and LFI 4 SAS,

4. Alternatively, the special allocation of foreign tax credits to Pritired lacks economic effect[39] under § 704(b). Accordingly,

---

[39] At trial, the IRS argued that the Pritired transaction lacked "substantial economic effect." Treas. Reg. § 1.704-1(b)(2). Principal urges the Court to find that the IRS has raised a "new matter" and that the Government be charged with the burden of proof because "substantial economic effect" requires the presentation of different evidence to prove "substantiality." *See Estate of Falese v. Comm'r*, 58 T.C. 895, 898-99 (1972); Tax Court Rules of Practice and Procedure 142(a).

The Court rejects Principal's argument that "substantial economic effect" is a new matter because the Government explained that the FPAA merely misstated the Treasury Regulation. "Substantiality" and "economic effect" are clearly two prongs of the "substantial economic effect" test and throughout § 1.704-1, the "substantial economic effect" test is consistently referred to as the "economic effect" test. *See, e.g.,* § 1.704-1(b)(2)(iv), (b)(4)(iii), *et seq.* Principal knew what the Government is contending, and any argument to the contrary is a red herring. *See Senda v. C.I.R.*, 433 F.3d 1044, 1046 (8th Cir. 2006) ("A new position taken by the Commissioner is not

the foreign tax credits must be reallocated in accordance with
the partners' interests in Pritired.

5. Alternatively, the transaction generating the foreign tax
credits lacks economic substance. Therefore, the foreign tax
credits must be disallowed.

Ex. 243. To put it simply, the IRS had five alternative reasons for why the Pritired

transaction was not a partnership: (1) the PCs and B Shares are or are like debt

instruments and partnerships cannot be formed in the absence of equity; (2) the

substance of the transaction was a loan from Pritired to the French Banks; (3) the anti-

abuse rule requires the transaction to be characterized as a loan; (4) the special

allocation of foreign tax credits lacks economic effect; or (5) the transaction lacks

economic substance.

In effect, the IRS determined that Pritired was not entitled to claim an allocation

of foreign taxes under I.R.C. § 702(a)(6) and disallowed Pritired's claimed share of

foreign taxes for the years 2002 and 2003 in the amounts of $24,370,399 and

$18,217,557, respectively. Undisputed Facts ¶ E. By disallowing the foreign taxes,

the foreign tax credits claimed by Principal for the taxable years 2002 and 2003 are

also disallowed. *Id.*

Principal then timely filed this request for judicial review of the FPAA. §

6226(a)(2). Neither party disputes the Court's jurisdiction over the issues of law.

### D. Burden of Proof

"The Commissioner's determinations in a FPAA are generally presumed correct,

and a party challenging an FPAA has the burden of proving that the Commissioner's

_____

necessarily a 'new matter' if it merely clarifies or develops the Commissioner's original
determination without requesting the presentation of different evidence, being inconsistent with
the Commissioner's original determination, or increasing the amount of the deficiency.")
(quotation omitted).

determinations are in error." *Historic Boardwalk Hall, LLC v. C.I.R.*, 136 T.C. No. 1, 19 (2011) (citing Tax Court Rules of Practice and Procedure 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. Pship. v. Comm'r*, 107 T.C. 94, 104 (1996)); *see also Caulfield v. C.I.R.*, 33 F.3d 991, 993 (8th Cir. 1994). This is because an FPAA is a "functional notice of deficiency . . . [and a] determination of deficiency . . . is generally given a presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect." *Sealy Power, Ltd. v. C.I.R.*, 46 F.3d 382, 385-86 (5th Cir. 1995) (citing *United States v. Janis*, 428 U.S. 433, 441 (1976); *Helvering v. Taylor*, 293 U.S. 507, 514-15 (1935); *Welch v. Helvering*, 290 U.S. 111, 114 (1933); *Portillo v. Comm'r*, 932 F.2d 1128, 1133 (5th Cir. 1991)).

## IV. ANALYSIS OF THE FPAA

The FPAA proposed five reasons for why Pritired's foreign tax credits should be disallowed. The first two reasons concerned the proposal that the PCs and B Shares are debt, and as a result, the transaction should be characterized as a loan. The FPAA also proposed that the Pritired transaction lacks economic substance. Next, the FPAA proposed that the Pritired transaction violates the anti-abuse rule in Treas. Reg. § 1.701-2. Alternatively, the FPAA proposed that the special allocation of foreign tax credits to Pritired lacks substantial economic effect under § 704(b). The Court analyzes each proposal in turn and to the extent necessary.

### A. Whether the Pritired Transaction Should Be Characterized as a Loan

Principal argues that the PCs and B Shares are equity and the Pritired transaction should not be characterized as a loan instead of an equity investment. Principal asserts that the PCs' classification as debt for French banking, accounting, and income tax purposes is not determinative of their classification for U.S. income tax purposes.

63

Principal cites two primary reasons for classifying the PCs as equity: (1) the PCs were swapped into an equity-like return under the PC Swaps; and (2) the doctrine of substance over form is controlling, and while the form suggests the PCs were debt, in substance the PCs were equity. Principal suggests the aggregate characteristics of the PCs are more equity-like than debt-like and that the PCs represented equity interests in the SAS in the "nature of preferred stock."

The IRS argues that the Pritired transaction was a loan and not an equity investment. It interprets the substance over form doctrine to mean exactly the opposite: the PCs were designed to look like equity, but in substance were debt. The IRS argues that Principal entered into a partnership with the SAS only to recoup foreign tax credits through their distributive shares of foreign income taxes the partnership paid or accrued. The IRS suggests that the Pritired transaction was not a partnership and the PCs and B Shares have characteristics more similar to debt than equity. Consequently, the IRS urges this Court to find that the Pritired transaction was a loan, and not an equity investment.

## 1. Intent to Form a Partnership

"In determining the economic reality of a transaction, courts must analyze the substance of a transaction and are not restricted by its form." *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999) (citations omitted); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) ("we are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same"). Principal argues that the Pritired transaction was a partnership and it can claim a tax credit under I.R.C. § 901 for its distributive share of foreign income taxes paid or accrued. However, the IRS argues that the Pritired transaction was a loan, not a partnership, and lenders cannot claim foreign tax credits for taxes paid by their borrowers. *See*

*generally Helvering v. Clifford*, 309 U.S. 331, 335-36 (1940) (income must be taxed to him who earned it).

The Court must first determine whether the Pritired transaction was in substance a loan from the U.S. Taxpayers to the French Banks, and not an equity investment in a partnership. The Supreme Court in *Comm'r v. Culbertson*, 337 U.S. 733 (1949), set out the seminal test for ascertaining whether participants in an enterprise intended to form a partnership. *See also Comm'r v. Tower*, 327 U.S. 280, 290 (1946); *Estate of Smith v. Comm'r*, 313 F.2d 724, 728-30 (8th Cir. 1963) (adopting *Tower* and *Culbertson* analyses to all partnership determinations). In *Culbertson*, the partnership test focuses on the parties' intent and the economic reality of the transaction:

> The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by *Tower*, but whether, considering all the facts – the agreement, the conduct of the parties in the execution of its provisions, their statements, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent – the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

*Id*. at 742.

The Supreme Court's test makes it clear that the Court must look to the totality of the circumstances in discerning the intent of the parties to form a partnership. No one single factor controls. Here, any interpretation of whether a partnership exists is constrained by the debt and equity characteristics of the financial instruments involved.

Consequently, in order to determine whether the Pritired transaction was a partnership, the Court considers the debt and equity characteristics of the PCs and B Shares. *See TIFD III-E, Inc. v. United States* (*Castle Harbour*), 459 F.3d 220, 232 (2d Cir. 2006) ("Consideration whether an interest has the prevailing character of debt or

equity can be helpful in analyzing whether, for tax purposes, the interest should be deemed a bona fide equity participation in a partnership."); *ASA Investerings Partnership v. C.I.R.*, 201 F.3d 505, 513 (D.C. Cir. 2000) ("whether, all facts considered, the parties intended to join together as partnerships to conduct business activity for a purpose other than tax avoidance."). Whether the Pritired transaction involves debt or equity presents a mixed issue of fact and law. *See J.S. Biritz Constr. Co. v. United States*, 387 F.2d 451, 455 (8th Cir. 1967). From analyzing these characteristics, the Court can then conclude whether the Pritired transaction was in the nature of a loan or an equity investment.

## 2. Debt and Equity Characteristics

The Eighth Circuit Court of Appeals in *Biritz* identified several objective factors to apply in a debt-equity analysis. The factors include: (1) whether the loans "are in fact needed for capital purposes;" (2) whether the "purported loans were made in proportion to equity holdings;" (3) if the venture must be successful as a predicate for repaying the loan; (4) a fixed date of payment of the note; (5) if the note was subordinate to other debts; (6) if "third parties would have made the loan under the same conditions;" (7) if the loan was secured by collateral; (8) whether "a provision was made for a sinking fund to retire the loan;" (9) if the lender participated in the management of the enterprise; and (10) if the enterprise had a large proportion of debt to equity. 387 F.2d at 457. In *Matter of Uneco, Inc.*, the Eighth Circuit also listed additional, non-exhaustive factors to consider: (1) "the names given to the certificates evidencing the indebtedness; (2) "the source of the payments;" (3) "the right to enforce the payment of principal and interest;" (4) "the intent of the parties;" (5) "identity of interest between creditor and stockholder;" (6) the enterprise's ability to obtain other loans; and (7) "the failure of the debtor to pay on the due date or to seek a postponement." 532 F.2d 1204, 1208 (8th Cir. 1976) (citing *In re Indian Lake Estates,*

*Inc.* 448 F.2d 574, 578-79 (5th Cir. 1971)). Other circuits have also adopted many of these factors. *See Ellinger v. United States*, 470 F.3d 1325, 1333-34 (11th Cir. 2006); *Castle Harbour*, 459 F.3d at 233-40; *Indmar Prods. Co., Inc. v. C.I.R.*, 444 F.3d 771, 776-77 (6th Cir. 2006); *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1352-53 (Fed. Cir. 1999); *Estate of Leavitt v. C.I.R.*, 875 F.2d 420, 425 n.11 (4th Cir. 1989).

In the case at bar, the Court incorporates by reference its analysis of the debt and equity attributes of the PCs and B Shares in Section II.D.2. These attributes weigh in favor of determining the PCs and B Shares to be debt and in the nature of a loan. In analyzing these "hybrid securities," the Court must "consider[] the nature of the original investment in ascertaining the relationship intended to be created." *Kraft Foods Co. v. C.I.R.*, 232 F.2d 118, 126 (2d Cir. 1956).

Here, there was no possible "upside potential" because the returns were capped and Pritired intended to recover its original $300 million investment, regardless of the performance of SAS. *See Slappy Drive Indus. Park v. United States*, 561 F.2d 572, 581 (5th Cir. 1977) ("shareholders place their money 'at the risk of the business' while lenders seek a more reliable return . . . contributors of capital undertake the risk because of the potential return, in the form of profits and enhanced value, on their underlying investment. Lenders, on the other hand, undertake a degree of risk because of the expectancy of timely repayment with interest.") (citations omitted). Evidence and testimony clearly establish that Pritired intended to recover a "sum certain" amount of approximately $300 million (less clawbacks) at the end of the five-year investment period. *See Castle Harbour*, 459 F.3d at 236, 239; *Uneco*, 532 F.2d at 1208 (factors of debt include "whether there was a fixed date for payment of the note and a reasonable expectation of payment of that date."); *Harlan v. United States*, 409 F.2d 904, 908 n.4 (5th Cir. 1969) (characteristics of debt instrument include "unconditional

67

obligation, to pay a principal sum certain, on or before a fixed maturity date not unreasonably far in the future, with interest payable in all events and not later than maturity."). These instruments also had a right to force the payment of principal and to force liquidation of the enterprise if the investment was not repaid in full at the end of the approximately five-year term. The PCs and B Shares, before the PC Swap, originally had a fixed rate of return, *see Uneco*, 532 F.2d at 1208 (debt has "the right to enforce the payment of principal and interest"), but as a result of the PC Swaps, the Pritired transaction had an "ironclad" assurance there would always be tax credits built into the tax return. *See Castle Harbour*, 459 F.3d at 239. The Court finds that there was a reasonable expectation of payment that would always involve tax credits.

Additionally, the PCs and B Shares were only subordinate to the convertible notes and A Shares and there were no other general creditors. *See Castle Harbour*, 459 F.3d at 237. The B Shares only had 2% of the voting rights and did not participate in management of the portfolios the SAS owned. *See id.* at 258. The labels attached to the PCs ranged from "Undated Subordinated Securities" to "Preferred Stock;" there was no internal consistency as to whether the PCs were debt or equity. *See generally Scriptomatic, Inc. v. United States*, 555 F.2d 364, 370 (3d Cir. 1977) (debt referred to as "subordinated debentures" rather than "preferred stock"). Indeed, it appears clear from the start that the "hybrid securities" label enabled the flexibility to argue for debt, or equity, when necessary or convenient. For example, the PCs were debt for French tax and U.S. GAAP purposes, but equity for U.S. tax purposes. There was never a clear indication from the labels what the PCs were meant to be, and the "stapling" of the B Shares to the PCs also blurred the line for the B Shares. *But see Hardman v. United States*, 827 F.2d 1409, 1412 (9th Cir. 1987) (language suggests instruments were debt).

The use of funds also lends credence to the fact that the financial instruments

were debt. Pritired loaned the SAS money to buy securities under repo arrangements with the French Banks. The French Banks retained all investment risk and stringent investment conditions forced the French Banks to ensure the portfolio held top-flight securities as, in essence, collateral for the loan. *See Castle Harbour*, 459 F.3d at 239.

All together, these characteristics and attributes weigh in favor of finding that the PCs and B Shares were debt instruments and the substance of the transaction was a loan. The Court, in having carefully weighed the objective facts and subjective intent of the parties, finds that the Pritired transaction was in the nature of a loan, rather than an equity investment. *Uneco*, 532 F.2d at 1209. Peeling back the layers of the partnership agreements makes it clear that the structure and characteristics of the Pritired transaction were meant to create the appearance of equity when it was not. The inability for Principal to explain the business purpose of the PC Swaps, besides a foreign tax credit purpose, is indicative that Principal intended to reap the maximum financial benefit from the foreign tax credits. The malleability and flexibility of the characterization and attributes of the PCs (stapled to the B Shares) allowed Principal to put a foot in both camps; the Pritired transaction could be characterized as a loan or equity investment when needed. The Pritired transaction "was the complete creature" of the parties "who had the power to create whatever appearance would be of tax benefit to them despite the economic reality of the transaction." *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968). But the truth remains; the funds Pritired advanced to the SAS "were advanced with reasonable expectations of repayment regardless of the success of the venture [and] were not placed at the risk of the business." *Castle Harbour*, 459 F.3d at 233.

Consequently, the Court finds that as a practical matter, the Pritired transaction was designed to be a loan. *See Culbertson*, 337 U.S. at 742. The parties acted with the intent to structure a transaction that appeared to be equity but was debt in substance.

*B. Whether the Pritired Transaction Lacks Economic Substance*

Next, Principal argues that the Pritired transaction had economic substance because there were several non-tax business purposes for entering into the transaction. Principal cites the purposes of obtaining higher yields on foreign bonds, obtaining the enhanced yield on the transaction itself, duration-matching with respect to five-year liabilities, and greater portfolio diversification. Principal also states that it had a real expectation of profit. Officials at Principal credibly testified that its investment strategy, generally, is to make money on the investments, not on tax credits.

The IRS contends that the Pritired transaction had no economic substance. It advances that the transaction was a "sham" and that Principal's avowed non-tax "business purposes" are a "self-serving, *post hoc* rationale, to justify a transaction which was conceived, designed and executed to generate its only benefit in the form of tens of millions of dollars in tax credits." Moreover, that Pritired intentionally forfeited its right to any payments on the deal as originally structured.

The Supreme Court developed the economic substance and "sham" transaction test in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). The Court stated that a transaction will be accorded tax recognition only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Id.* at 583-84; *see also Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 543 (5th Cir. 2009) ("The economic substance doctrine allows courts to enforce the legislative purpose of the [Tax] Code by preventing taxpayers from reaping tax benefits from transactions lacking in economic reality.") (alteration added). "Such transactions include those that have no business purpose beyond reducing or avoiding taxes, regardless of whether the taxpayer's subjective motivation was tax avoidance," *Stobie Creek Invests. LLC v.*

*United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010) (citations omitted), or "'ha[ve] no

valid, non-tax business purpose, . . . [such as when it] brings about no real change in

the economic relation of the taxpayers to the income in question.'" *Richardson v.*

*C.I.R.*, 509 F.3d 736, 741 (6th Cir. 2007) (quoting *Tower*, 327 U.S. at 291) (first

alteration added). But "where a transaction has economic substance and is

economically realistic, it should be recognized for tax purposes, and the fact that a

transaction is so arranged that the tax consequences are highly favorable to one of the

parties affords the Commissioner no license to recast it into one of less advantage.'"

*Wash. Mutual Inc. V. United States*, 636 F.3d 1207, 1221 (9th Cir. 2011) (quoting

*Lewis & Taylor, Inc. V. Comm'r*, 447 F.2d 1074, 1077 (9th Cir. 1971)).

The Eighth Circuit has since implied it would follow a two-prong test for

identifying a sham transaction:

> a transaction will be characterized as a sham if 'it is not
> motivated by any economic purpose outside of tax
> considerations' (the business purpose test), and if it 'is without
> economic substance because no real potential for profit exists'
> (the economic substance test).

*IES Indus., Inc. v. United States*, 253 F.3d 350, 353 (8th Cir. 2001) (quoting *Rice's*

*Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91-92 (4th Cir. 1985)); *see also Shriver*

*v. Comm'r*, 899 F.2d 724, 725-26 (8th Cir. 1990). The "business purpose test" is

subjective and the proper inquiry is "'whether the taxpayer was induced to commit

capital for reasons only relating to tax considerations or whether a non-tax motive, or

legitimate profit motive, was involved.'" *IES Indus.*, 253 F.3d at 354-55 (quoting

*Shriver*, 899 F.2d at 726). "The second prong of the sham inquiry, the economic

substance inquiry, requires an objective determination of whether a reasonable

possibility of profit from the transaction existed apart from tax benefits." *Rice's Toyota*

*World,* 752 F.2d at 94. "[W]hen the form of the transaction comports with its

substance, the form will be respected for tax purposes, however, when the form of the

transaction is nothing more than 'the simple expedient of drawing up papers,' . . . when the objective economic realities are to the contrary,' the substance of the transaction controls." *Consolidated Edison Co. of New York v. United States*, 90 Fed. Cl. 228, 266 (2009) (quoting *Frank Lyon Co.*, 435 U.S. at 573) (first alteration added) (where a last-in-first-out transaction provided tax and bookkeeping advantages, as well as non-tax advantages, the Federal Claims Court ruled that there was economic substance to the transaction).

The economic substance doctrine is case-specific and requires a very fact-intensive analysis. In *Keeler v. C.I.R.*, 243 F.3d 1212 (10th Cir. 2001), a taxpayer's "straddle" trades of stock positions were held to lack economic substance. The taxpayer engaged in "open-switch-close" trading which took place in three steps: (1) he "opened" a position in a stock by buying or selling a straddle on a stock; (2) he would "switch" by selling or canceling the losing leg of the trade and buy a replacement leg towards the end of a tax year to recognize a tax loss; and (3) he would "close" out his position in a new tax year and "recognize gains approximating taxable loss" from the prior year. *Id.* at 1215. The court held that the "trading program" offered "only illusory opportunity for economic profit" and any potential profit was "anemic beside [the] considerable capacity for tax gaming." *Id.* at 1214. The trades epitomized the "raison d'être" of tax avoidance, which was bolstered by the taxpayer's lack of any "detailed projections of realistic economic returns taking into account transaction fees and foregone interest." *Id.* at 1217.

In another case, a taxpayer attempted to generate a fictional tax loss to offset income from the exercise of stock options. *Sala v. United States*, 613 F.3d 1249 (10th Cir. 2010). Sala realized $60 million in income from exercising stock options and then his wholly-owned S Corporation ("Solid") formed a partnership and acquired long and short foreign currency options for $8 million cash. *Id.* at 1250-51. The long and short

options had approximate total sales prices of $61 million each, if exercised. *Id.* at 1251. The partnership was liquidated after several weeks and Sala calculated Solid's basis in the partnership to be $69 million, including the value of the long options only (at $61 million) plus the cash contribution of $8 million. *Id.* at 1252. Solid sold the foreign currency contracts for less than $1 million and claimed a total calculated cash loss of $60 million. *Id.* The court held that the "claimed loss generated by the program was structured from the outset to be a complete fiction." *Id.* at 1253. It noted the severe discrepancy from the earning's potential of the long and short options (at $550,000 over one year) "dwarfs" the expected tax benefit of nearly $24 million. *Id.* at 1254. It rejected Sala's assertion that some profit was enough to satisfy the economic substance test because the "existence of some potential profit is 'insufficient to impute substance into an otherwise sham transaction' where a 'common-sense examination of the evidence as a whole' indicates the transaction lacked economic substance.'" *Id.* (quoting *Keeler*, 243 F.3d at 1219). The court continued that any actual profit was "negligible in comparison to the $24 million tax benefit which would not have been achieved but for this pre-determined court of action." *Id.*

In *Compaq Computer Corp.* and *Historic Boardwalk Hall, LLC*, courts found that the transactions at issue had economic substance. In *Compaq*, Compaq engaged in a foreign stock transaction involving the purchase and resale of $868 million of Royal Dutch American Depository Receipts ("ADRs"). *Compaq Comp. Corp. v. Comm'r*, 277 F.3d 778, 779 (5th Cir. 2001). Compaq was entitled to a gross dividend of $22.5 million from the ADRs, less $3.4 million in Netherlands tax withheld from the dividend, for a net dividend of approximately $19.2 million. *Id.* at 780. The IRS challenged Compaq's claimed foreign tax credits of $3.4 million because the loss Compaq recognized when it sold the ADRs of $19.2 million was equal to the net dividend Compaq received, which caused a net loss after Compaq paid its transaction

expenses. *Id.* at 782. Citing the Eighth Circuit's decision to a similar set of facts in *IES Indus.*, the court held that Compaq was entitled to the foreign tax credits in order to prevent double taxation on the dividend income. *Id.* at 785-86. The court also found that a primary purpose of getting "otherwise unavailable tax benefits . . . need not invalidate the transaction" because Compaq had other legitimate, profit-seeking business purposes for engaging in the transaction. *Id.* at 786-87. The court held that "the ADR transaction had both a reasonable possibility of profit attended by a real risk of loss and an adequate non-tax business purpose. The transaction was not a mere formality or artifice but occurred in a real market subject to real risks." *Id.* at 788.

Likewise, the court in *Historic Boardwalk Hall, LLC v. Comm'r*, 136 T.C. No. 1, 136 T.C. 1 (2011), found that a transaction utilizing rehabilitation tax credits ("RTCs") was not a sham and did not lack economic substance. In that case, the New Jersey Sports and Exposition Authority and Pitney Bowes ("PB") formed Historic Boardwalk Hall, LLC ("HBH") for the purpose of allowing PB to invest in the rehabilitation of the East Hall, a historic building. *Id.* at 3. For the tax years at issue, East Hall underwent massive and substantial renovation. *Id.* at 5. Through various contractual provisions, PB had a near-certain 3% return on its investment in the project. *Id.* at 10. The IRS challenged the RTCs allocated to PB and argued that the partnership had been "created for the express purpose of improperly passing along tax benefits." *Id.* at 17. The IRS argued that HBH was structured to create "no economic effect on its partners" and "the parties' economic positions were all fixed and unaffected by the return from HBH in any circumstance." *Id.* at 21. The Tax Court disagreed and stated that the combined RTCs and the 3% return to PB was sufficient economic substance. In its analysis, the court looked at *Sacks v. Comm'r*, 69 F.3d 982 (9th Cir. 1995), in which Congress had explicitly authorized investment tax credits for solar energy equipment. *Id.* In *Sacks*, the Ninth Circuit found that a sale-leaseback

transaction had economic substance because: (1) the taxpayer had a genuine obligation to pay; (2) fair market value was paid; (3) the tax benefits otherwise "would have existed for someone;" (4) solar energy was a genuine business; and (5) "the business consequences of a rise or fall in energy prices were genuinely shifted to the taxpayer." *Id.* (citing *Sacks*, 69 F.3d at 988). The court noted, however, that another sale-leaseback transaction with no chance of profitability lacked economic substance. *Id.* at 26-27 (citing *Friendship Dairies, Inc. v. Comm'r*, 90 T.C. 1054, 1064 (1988)). The *Historic Boardwalk Hall* court held that the facts were more similar to *Sacks* rather than *Friendship Dairies*. As the court stated, the RTCs were designed to "encourage taxpayers to participate in what would otherwise be an unprofitable activity." *Id.* at 26. The court held that the transaction had economic substance because PB's contribution increased the rehabilitation funds available and the parties would each receive a net economic benefit if the renovation was successful. *Id.* at 27.

These cases offer useful analysis to determine when there is sufficient business purpose and potential profit to warrant economic substance. The Court must employ the implied test from *IES Industries*, in which the Court examines both the subjective business purpose of the Pritired transaction and an objective determination of the economic realities. *See* 253 F.3d at 354-55. Because the Eighth Circuit has not definitively stated that a transaction would fail to have economic substance if it lacked one of the prongs, the Court will analyze the facts as applied to each prong, while also considering the Pritired transaction as a whole.

As to the subjective business purpose, the Court strains to find any credible business purpose to the transaction not involving the FTCs. Principal's arguments, *inter alia*, that it wanted higher yields on foreign bonds and an enhanced yield on the transaction itself are not persuasive. Principal claims it had multiple business purposes for entering into the transaction, but these purposes are very difficult to square with the

reality displayed in Figure 5, *infra*. To the extent that the transaction had some legitimate business purpose, this purpose would not save the transaction. *See IES Indus.*, 253 F.3d at 353; *Shriver*, 899 F.2d at 725-26. While giving due deference to *IES Industries* and its progeny, these stated business purposes do not override the fact that, at its core, this is a $300 million loan that allowed French Banks to borrow below their ordinary borrowing cost and converted the yield on exceedingly low-risk securities to an exceedingly high rate. The only way to get this outcome was with the FTCs.

As the Court has repeatedly noted throughout this opinion, Principal was incapable of answering how it could justify approving a near-certain negative NPV transaction if the FTCs were excluded from the calculus. For while it is "generally more important to focus on 'what was done,' than 'why it was done,'" *Indmar Prods.*, 444 F.3d at 779, Principal could not explain why it would approve a negative NPV transaction, fail to appropriately consider different analyses based on fluctuating interest rates, or consider how fluctuating interest rates could impact the cash flow.

Additionally, Principal could not explain *why* it engaged in the PC Swap; it exchanged a positive cash flow (based on LIBOR plus 1%) for a lower cash flow (based on LIBOR plus a set percentage less French taxes). The Court strains to find any purpose in engaging in the PC Swaps. There was also no documentation in the record to explain the business purpose for engaging in the PC Swap, except for the obvious conclusion that this was how Principal could claim the FTCs.

The Court finds that the Pritired transaction was was not desirable for Principal other than to generate and claim FTCs. *Frank Lyon*, 435 U.S. at 583-84, in order to generate FTCs. The real "business purpose" of the transaction seemed to be the use of FTCs to improve, or leverage, French borrowing power and enhance low risk yields through the FTCs. *Stobie Creek*, 608 F.3d at 1375. The Court concludes that the subjective business purpose of the Pritired transaction was to enhance low yield

investments through the FTCs. *See Shriver*, 899 F.2d at 726.

Next, the Court looks to whether there was any objective determination of a reasonable possibility of profit or that the economic realities suggested a real expectation of profit. Principal offers several post-hoc reasons to explain the discrepancy in Pritired's performance from the Pritired Model's projections but the Court does not find these arguments compelling. The projected IRR without FTCs was less than the tax exempt yields for similarly-rated bonds. The projected after-tax cash-only IRR was 4.32%, but this jumped to 12.41% for including the FTCs. Absent the FTCs, the economic realities suggest that a corporation would not choose to earn less money on a transaction than could be generated by general obligation municipal bonds.

Additionally, the Court considers the economic realities in light of the "clawbacks," interest rate floors built into the transaction, and the PC Swaps. The interest rate floors simply moved money around within the French Banks; the wholly-owned SAS received money from the French Banks and kept the general revenue from the SAS investment artificially high. Likewise, it appears unlikely that the parties would build in a mechanism like the clawback, unless there was some forethought that changing interest rates could equalize the returns of the transaction by shifting cash flows from later years.

Finally, the economic realities are strained when the Court considers the investments of the SAS. The SAS engaged in a sale-leaseback of investments and assets already owned by the French Banks and the only new capital generated from the transaction came entirely from the U.S. Taxpayers. There were also restraints put on the types of investments SAS could have and, as a result, the portfolio SAS held was guaranteed to always be of the highest quality. Pritired took no real economic risk by investing in the SAS because any market fluctuations were controlled by restrictions placed on the investment portfolio.

The Court finds that the economic realities indicate that the Pritired transaction was not an "exercise of good business judgment," but was an investment designed to appear like something that it was not. *IES Indus.*, 253 F.3d at 355. While the court in *IES Industries* noted that "a transaction should [not] be tagged a sham for taxpayers merely because it does not involve excessive risk," 253 F.3d at 355, the Pritired transaction was designed to have almost *no* risk to the U.S. Taxpayers.

For these reasons, the structuring of Pritired for the purpose of generating FTCs through the PC Swaps appears more similar to the structuring of the trading in *Keeler* and *Sala* than the scenarios in *Compaq* and *Historic Boardwalk Hall*, whereby the taxpayers attempted to avoid paying taxes based on generating illusory tax losses. Like *Keeler* and *Sala*, any potential profit was "anemic" and "dwar[fed]" compared to the expected FTCs. While the Eighth Circuit has not explicitly ruled on this issue, the Court finds that merely the "existence of some potential profit is 'insufficient to impute substance into an otherwise sham transaction' where a 'common-sense examination of the evidence as a whole' indicates the transaction lacked economic substance." *Sala*, 613 F.3d at 1254 (quoting *Sala*, 243 F.3d at 1219). From the outset, the parties all planned for Pritired to primarily generate its return through FTCs and this is an abusive arrangement.

Unlike *Compaq*, where the primary purpose was getting "otherwise unavailable tax benefits," there are not other legitimate, profit-seeking business purposes for engaging in the transaction. 277 F.3d at 786-87. For similar reasons, the facts here at hand also do not support making a finding for economic substance as the *Historic Boardwalk Hall* court found. Unlike the RTCs at issue in *Historic Boardwalk Hall*, FTCs are available to *prevent* double-taxation, not to generate an enhanced return on the basis of structuring transactions to increase the available FTCs. Also, the Pritired transaction did not increase the investment funds available or add in any way to the

investment return, as the only "new" money came from the U.S. Taxpayers and the SAS made $1.23 billion in investments the French Banks already owned. Here, the record indicates that the Pritired transaction would have a cash return and IRR lower than an otherwise comparable investment in a general obligation municipal bond.

Likewise, Principal's argument fails that the Pritired transaction has economic substance because it complied with Notice 98-5 (which was withdrawn in early 2004). Nowhere in Notice 98-5 did the IRS say that any transaction would have economic substance and be "saved" by staying within a certain ratio. The Notice described transactions that would be considered abusive and Principal interpreted that to mean that the IRS was putting an implicit cap on FTCs. The Notice did not suggest there would be an "acceptable" ratio for FTCs, but instead, stressed that the IRS would not permit abusive arrangements, such as when "foreign tax credits are effectively purchased . . . [and] where the expected economic profit from the arrangement is insubstantial compared to the foreign tax credits generated." By its very terms, Pritired was engaging in the behavior that Notice 98-5 intended to address: Pritired's enhanced return was "bought" with the PC Swaps' return tied to a share of the French taxes. While the Court recognizes that Notice 98-5 was in effect and was not withdrawn until the Pritired transaction nearly ended, IRS Notices are only entitled to "some weight." *Bankers Life*, 142 F.3d at 978.

Moreover, the Court finds that, while the Pritired transaction fails each prong of the *IES Industries* separately, the Pritired transaction also lacks economic substance when looking at the transaction cumulatively. On balance, the Court finds that the Pritired transaction was designed to appear as a partnership equity investment, but was primarily structured to generate FTCs.

### C. Whether the Pritired Transaction Violates the Anti-Abuse Rule

Next, Principal argues that the Pritired transaction did not violate the anti-abuse

rule of Treas. Reg. § 1.701-2.  Principal asserts that the foreign tax credits were a factor in the yield of the transaction and were not the principal purpose for entering into the transaction.  Instead, Principal asserts that the principal purposes of the transaction were to obtain higher yields on foreign bonds, obtain the transaction's enhanced yield, accomplish duration-matching with respect to its five-year liabilities, and to greater diversity its investment portfolio.

The IRS asserts that obtaining the foreign tax credits was the primary or principal purpose for forming and using the SAS.  It argues that the partnership was formed and used contrary to the intent of Subchapter K because the purpose of the Pritired transaction was for tax avoidance.

The anti-abuse rule of Treas. Reg. § 1.701-2(a) states the following:

> (1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.
> (2) The form of each partnership transaction must be respected under substance over form principles.
> (3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

These three requirements must be met in order for the Court to determine whether Principal and the Pritired transaction has violated the anti-abuse rule.  *See Countryside Ltd. P'ship v. C.I.R.*, T.C. Memo, 2008-3, 2008 WL 41414, at *23-24 (2008) (explaining anti-abuse rule).  Pursuant to Treas. Reg. § 1.701-2(b)(1)-(2), the remedy when partnership are used contrary to the intent of Subchapter K, as applicable here, is to (1) disregard a purported partnership in whole or in part, or (2) disregard a purported partner of the partnership as a partner.

The regulations further instruct courts to conduct a facts and circumstances

analysis of the transaction, such as whether "[t]he present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly." Treas. Reg. § 1.701-2(c)(1).

In *Wells Fargo & Co. v. United States*, 641 F.3d 1319 (Fed. Cir. 2011), the Federal Circuit examined the anti-abuse regulation in detail. In that case, Wells Fargo claimed $115 million in deductions on the basis of its participation in sale-in, lease-out ("SILO") transactions. The Court of Federal Claims denied the deductions and the Federal Circuit affirmed. *Id.* at 1320-21. Briefly, a SILO transaction is when a tax-exempt entity sells an asset to a private investor and then leases the asset back. *Id.* at 1321. SILOs are tax advantageous because they allow the investor to take advantage of certain depreciation deductions, among other things. *Id.* at 1322. The Court of Federal Claims held that Wells Fargo only participated in SILO transactions "when it had sufficient 'tax capacity' to use the tax benefits of the transactions," and that "other than the tax advantages, Wells Fargo received no net economic benefit from entering into the SILO transactions." *Id.* at 1324. In applying the anti-abuse rule, the Federal Circuit looked at whether Wells Fargo was "'subverting the legislative purpose of the tax code.'" *Id.* at 1325 (quoting *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed. Cir. 2006)). It found that it was an abusive transaction because Wells Fargo never acquired the "benefits and burden of ownership in the leased assets." *Id.* At particular issue, was whether there was uncertainty in whether the tax-exempt entities would exercise their options to repurchase the assets," because that would impact whether the assets still retained some economically useful life. *Id.* Further, the court stated:

> We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abuse of the

81

> tax system. The appropriate inquiry is whether a prudent
> investor in the taxpayer's position would have reasonably
> expected that outcome. Characterization of a tax transaction
> based on a highly probable outcome may be appropriate,
> particularly where the structure of a transaction is designed to
> strongly discourage alternative outcomes.

*Id.* at 1325-26 (citations omitted). The court in *Wells Fargo* made clear that it considered the SILO transactions to be "win-win situations for all of the parties involved because free money – in the form of previously unavailable tax benefits utilized by Wells Fargo – was divided among all parties." *Id.* at 1330.

In a similar manner to the economic substance test, the anti-abuse rule focuses on what the primary motivation and economic realities of the Pritired transaction entailed. As to the first point, the Court has already found that the Pritired transaction was not a bona fide partnership. *See* Sections IV.A.1 and IV.A.2. As a practical matter, the Pritired transaction did not intend to form a partnership because the transaction was designed to be a loan to the French Banks (and SAS) and not an equity investment. The Court addresses the issue of "business purpose" at length in the previous section, and as "substantial business purpose" implies a higher standard than a "business purpose," the Court finds that the Pritired transaction would likewise not have "substantial business purpose." The Pritired transaction was designed to transfer and shift the payment of French taxes to instruments that would otherwise have a low and undesirable return. On this reason alone, the Court finds that the Pritired transaction runs afoul of the anti-abuse rule of Treas. Reg. § 1.701-2(a).

Although in order to comply with the anti-abuse rule a transaction must meet all three prongs of the test, and the Pritired transaction fails the first prong, the Court briefly looks at the merits of the other two prongs. As to the second prong, the Court has also expounded at length upon why the substance of the transaction was a loan and

not an equity investment. The Court finds that the Pritired transaction also fails to meet this test.

Finally, it is also clearly apparent that the "partnership operations and of transactions between the partner and the partnership [do not] accurately reflect the partners' economic agreement and clearly reflect the partner's income." Treas. Reg. § 1.701-2(a)(3). Unlike the examples contained in Treas. Reg. § 1.701-2, the special allocation of the FTCs to Pritired did not have substantial economic effect because "any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result." The economic agreement contained in Pritired did not accurately reflect the partners' income and the transaction improperly shifted, for no discernable economic reason, FTCs to Pritired. This special allocation to Pritired of the French taxes, and corresponding FTCs, is inconsistent with the intent of Subchapter K. Like the situation in *Wells Fargo*, the FTCs were generated through "purely circular transactions that elevate form over substance." 641 F.3d at 1330.

The Court finds that in applying the anti-abuse regulation, the Pritired partnership may be disregarded and this results in disallowing the FTCs claimed by the U.S. Taxpayers for French taxes purportedly paid by SAS.

### D. Whether the Pritired Transaction Lacks Substantial Economic Effect

Principal also argues that the Pritired transaction had substantial economic effect pursuant to Treas. Reg. § 1.704-1(b)(2). The partnership agreement allotted a return to the PCs of gross return less the foreign income taxes allocated to them. It argues that the PCs' return could be affected substantially if the SAS' taxable income rose or fell, or if there was a change in the effective rate of French income tax imposed on the SAS income. Thus, Principal argues that the allocation of French taxes to Pritired had a substantial economic effect.

The IRS argues that the SAS Agreements allocated a disproportionate share of

83

the French tax expense to the U.S. Taxpayers, with an offsetting allocation of net income. The special allocations of French tax expense and net income lacked substantial economic effect and were not consistent with the partner's interest in the partnership.

"Under the regulations, the tax evasion/avoidance test essentially evolved into a substantial economic effect test." *Boynton v. C.I.R.*, 649 F.2d 1168, 1172-73 (5th Cir. 1981). Pursuant to Treas. Reg. § 1.704-1(b)(2), in order for an allocation to have substantial economic effect, the special allocation must have "economic effect" and the effect must be "substantial." *See also Ballantyne v. C.I.R.*, 341 F.3d 802, 808 (8th Cir. 2003) (explaining Treas. Reg. § 1.704-1(b)(2)). "Economic effect" is defined as "an economic benefit or economic burden that corresponds to an allocation, [and] the partner to whom the allocation is made must receive such economic benefit or bear such economic burden." Treas. Reg. § 1.704-1(b)(2)(ii). An allocation is substantial only "if there is a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." § 1.704-1(b)(2)(iii). An allocation is not substantial if:

> (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement, and
> (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation (or allocations) were not contained in the partnership agreement.

*Id.*

Because the Court has alternatively found in favor of the IRS on all the other proposed findings in the FPAA, the Court need not reach the question of whether the

Pritired transaction had substantial economic effect.

## V. CONCLUSION

The Court concludes that Principal has not made the requisite showing that the Commissioner's decision in the FPAA was in error. *See Caulfield*, 33 F.3d at 993. It is well-recognized that a taxpayer has the "legal right . . . to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits . . . ." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). But here, Principal used the PC Swaps to improperly create and devise a manner to transfer otherwise unallowable FTCs to Pritired.

Likewise, "[t]he substance of a transaction may prevail, however, when a taxpayer's 'reporting and actions show an honest and consistent respect for the substance of a transaction.'" *New York Guangdong Fin., Inc. v. C.I.R.*, 588 F.3d 889, 895 (5th Cir. 2009) (quoting *Estate of Weinert v. Comm'r*, 294 F.2d 750, 755 (5th Cir. 1961)). The Pritired transaction was designed in a very complicated and multi-level manner to mask what was in substance, a loan from the U.S. Taxpayers to the French Banks. Yet the facts demonstrate that Principal's focus and interest in the transaction was to generate FTCs.

Based on the foregoing findings of fact and conclusions of law, judgment shall be entered as follows:

(1) With respect to Count I, the Court enters judgment against Principal for its Petition for Readjustment of Partnership Item for 2002.

(2) With respect to Count 2, the Court enters judgment against Principal for its Petition for Readjustment of Partnership Item for 2003.

(3)    The Court awards the United States its costs in defending this lawsuit.

**IT IS SO ORDERED**.

**DATED** this 30th day of September, 2011.

JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA